**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MEDIA LODGE, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 20-12969 (JTD) |

**DECLARATION OF JEFF SIEGEL IN SUPPORT OF FIRST DAY MOTIONS**

I, Jeff Siegel, hereby declare under penalty of perjury:

1. I am the Chief Executive Officer of Media Lodge, Inc. (the "Debtor" or "Media Lodge"), a corporation organized under the laws of the State of Delaware with its principal place of business in Eden Prairie, Minnesota.

2. I have been serving as Chief Executive Officer of the Debtor since approximately 2014.

3. I submit this declaration ("Declaration") in support of the Debtor's chapter 11 bankruptcy petition and in support of the Debtor's "first day" motions and applications, described in further detail below (collectively, the "First Day Motions"). I am over 18 years of age and am competent to make this Declaration and testify to the facts set forth herein.

4. I, or those employees of the Debtor under my supervision, am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with current and former officers and other members of the Debtor's management team, senior personnel, and advisors, my review of relevant documents and information concerning the Debtor's operations and financial affairs as well as the Debtor's books and records, or my opinions based upon my experience and knowledge. If called as a witness to testify in this matter, I could and

would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

5. On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition (the "Petition") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") commencing the above-captioned bankruptcy case (the "Case"). It is anticipated that the Debtor will continue to manage its affairs and operate their businesses as Debtor and Debtor-in-possession pursuant and subject to the requirements of sections 1107(a) and 1108 of the Bankruptcy Code.

6. I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe the relief sought in each First Day Motion will allow for an orderly transition of the Debtor into these Cases and permit the Debtor to achieve their bankruptcy objectives as further described below.

7. Part I of this Declaration describes the Debtor's business, capital structure and the events leading to the filing of the Petition. Part II of this Declaration sets forth the First Day Motions[1] and sets forth the relevant facts in support of those motions.

## Background

**A. History of the Debtor**

8. Debtor was created in 2014 to manage the sale of advertising on GunBroker.com, and it has the exclusive right to sell advertising on that website. Debtor and GunBroker.com are sister companies; GunBroker.com is owned by IA Tech, LLC, and, before the merger with GunUp, Inc. ("GunUp"), IA Tech was also Debtor's sole owner. GunBroker.com is the world's largest online-auction website for firearms and hunting and shooting gear. As of 2018, GunBroker.com had more

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

than 3.5 million registered users and had sold more than $4 billion in merchandise. Until 2015, Debtor placed advertisements only on GunBroker.com.

9. In late 2014, Debtor sought to expand advertising beyond GunBroker.com and began discussing a merger with GunUp who ran a similar business. The parties ultimately agreed on a transaction in which GunUp would merge with Debtor. The final merger agreement signed by the parties was dated March 31, 2015, and the transaction closed the following day. Under the agreement, Debtor was to pay GunUp $300,000 at closing and issue 281,996 shares of stock to GunUp. Debtor was scheduled to pay additional money as follows: $200,000 on July 1, 2015, and $250,000 on each of May 15, 2016, and May 15, 2017. In addition, Debtor was scheduled to issue 563,990 more shares of stock—half on each of September 15, 2016, and March 15, 2018.

10. After the transaction closed, Debtor discovered that GunUp's assets were not as represented, and they performed well below expectations. Debtor concluded that GunUp had materially overstated its gross revenues and understated its expenses for 2014. Beyond that, GunUp had not been running ads on all the sites it claimed it had been. Nor did GunUp have relationships will all the sites it claimed it did. These deficiencies resulted in significantly less post-merger ad revenue than had been projected.

11. In the first half of 2016, Media Lodge terminated the former GunUp Publishing employees, withheld the remaining consideration (cash payments and stock transfers) due to GunUp under the merger agreement, and sued GunUp in Georgia for breach of contract. GunUp then filed an action in King County, Washington, asserting breach of contract and asserting that Media Lodge and its CEO, Jeff Siegel, had made material untrue statements or omissions in violation of the Washington State Securities Act (WSSA), chapter 21.20 RCW. Media Lodge brought its previously asserted claims as counterclaims in the Washington Action.

B.  **Debtor's Business Operations**

12. Media Lodge is an advertising brokerage. Website owners contract with Media Lodge to sell advertising space on their websites and related media. In exchange, Media Lodge remits a share of the advertising revenue, plus management fees. In large part, the advertisements are in the form of *banner advertisements* (ads in the form of images), video advertising and commerce.

13. Media Lodge's right to sell advertising on GunBroker.com began as an oral agreement and has now been memorialized in a written contract. Under the written contract, Media Lodge bills the advertisers, collects all advertising revenue, and remits to GunBroker.com its share, plus a management fee. GunBroker.com's overall share is about 40% to 50% (with specific underlying percentages depending on the form of media) (compare revenue for *Banner Ads* with *Banner Exchange*).[2] GunBroker.com invoices Media Lodge monthly for its share of advertising revenue.

14. In 2014, at Media Lodge's beginning, GunBroker.com received and deposited the advertiser payments in its bank account; thereafter, Media Lodge received the advertiser payments. But regardless of which entity received the payments, Media Lodge recorded 100% of the advertising revenue and expenses on its books, listing the amounts due to GunBroker.com on an intercompany account. This was consistent with the oral contract and Generally Accepted Accounting Principles (GAAP).

15. Led by CEO Jeff Siegel, Media Lodge quickly became successful, bringing in $1,833,674 in revenue in 2014 and over $3 million the following year. Setting aside the management fee it paid to its parent, IA Tech, Media Lodge essentially broke even in 2014 (add *Net Management*

---

[2] GunBroker.com's invoices and Media Lodge's financial statements refer to GunBroker.com's share as *Banner Exchange*.

4

*Fee* of $376,535 to *Net Income* of negative $383,687.29). But because Media Lodge in fact operated at a loss, IA Tech funded its operating shortfall with loans, recorded on the intercompany account.

16. Media Lodge had four full-time employees and was a valuable company. Its assets included $429,991 in accounts receivable as of year-end 2014, that figure would grow to $973,138 by the end of the first quarter of 2015. Meanwhile, Media Lodge had $28,762 in cash.

17. The Debtor's corporate headquarters is located at 11095 Viking Drive, Eden Prairie, MN 55344.

### C. Organizational Structure, Governance, and Current Management

18. The Debtor has two wholly owned subsidiaries: Media Lodge, LLC ("***LLC Sub***") and GunUp LLC ("***Acquisition Sub***," and with LLC Sub, the "***Non-Debtor Subsidiaries***"). LLC Sub is a non-debtor entity that Media Lodge, LLC that holds the contracts with 3rd party publishers and partners for which the Media Lodge organization sells advertising. LLC Sub receives and books the ad revenue and pays the publisher/partner their cut of the revenue according the terms of the contract with that publisher/partner. Acquisition Sub is a non-debtor entity that sells advertising for in-house and 3rd party web sites, social media, email lists and other media. The Debtor is wholly owned by TVP Investments LLC.

19. The Debtor has a single member board of director comprised of myself, Jeff Siegel. The officers of the Debtor include a President, Vice President and Secretary. The Debtor's' current management consists of myself, Jeff Siegel, as CEO; and Susan Lokey, Managing Member and Secretary.

### D. Capital Structure

20. As of the Petition Date, the Debtor was indebted to an affiliate, Gemini Direct Investments, LLC pursuant to that certain Secured Promissory Note dated March 31, 2015 originally between the Debtor and IA Tech in the aggregate amount of $9,382,132 with respect to intercompany

obligations   Approximately $2 million of the intercompany debt is secured by a security interest in substantially all of the Debtor's assets, but the remainder is unsecured.

21. In addition, as of the Petition Date, the Debtor's other major creditor was GunUp, Inc., to whom the Debtor is obligated on a judgment in the face amount of $2,478,990.77 issued by the Superior Court for the State of Washington in and for King County in Case No. 16-2-15005-5 SEA. The Debtor disputes the court's findings in the Washington Action and has appealed the Judgment.

22. The Debtor's remaining obligations constitutes unsecured debt of approximately $232,000 owed to trade creditors.

### E. Circumstances Leading to Chapter 11 Filing.

23. After the failed merger with GunUp, GunUp filed the Washington Action against the Debtor in June 2016. GunUp alleged multiple claims against Debtor, including breach of contract. The parties filed cross-motions for summary judgment. GunUp sought a determination that Debtor had breached the merger agreement. GunUp also sought to dismiss Debtor's counterclaims and third-party claims. Meanwhile, Debtor moved for summary judgment, seeking dismissal of GunUp's claims and affirmative relief on its breach-of-contract counterclaim.

24. The trial court granted GunUp's motions and denied Debtor's motions. The court determined as a matter of law that Debtor had made material misrepresentations to GunUp and failed to disclose material information to GunUp and granted rescission of the transaction. This meant that that GunUp would return to Debtor the shares of stock it received, and Debtor would compensate GunUp for the value of the consideration it gave for those shares.

25. After a nine-day valuation trial, the court found that GunUp was worth $1.411 million as of March 2015. After applying a $500,000 credit for Media Lodge's payments to GunUp, the court

entered a principal judgment of $911,000, plus 8% prejudgment interest, for a total judgment of $1,240,852.

26.     The court subsequently awarded GunUp $1,094,589.71 in attorney's fees and $138,956.13 in costs and entered a supplemental judgment. With accrued interest on the initial judgment, the supplemental judgment totaled $2,478,990.77 (the "Judgment").

27.     In July 2020, the Debtor timely appealed the Judgment to the Court of Appeals, Division I of the State of Washington, Case No. 80766-8 (the "Appeal"), which challenged the trial court's entry of the Judgment on a summary judgment basis as well as the court's calculation of damages.

28.     Since the Debtor filed the Appeal, GunUp has commenced garnishment actions against customers of Debtor's affiliate, Media Lodge, LLC ("LLC Sub")—not the Debtor—seeking to garnish funds that those customers owe to the Debtor. Although GunUp asserts that LLC Sub is an "other known name" of the Debtor, LLC Sub is a legally distinct entity. The Judgment was entered only against the Debtor, and not LLC Sub, who was not a defendant in the GunUp Action and has no liability on the Judgment.

29.     Since the filing of the of the action by GunUp, the Debtor has been significantly cash flow negative, as legal fees and other litigation costs have far exceeded the Debtor's assets, which primarily consist of its equity interests in the Non-Debtor Subsidiaries. These excess costs have largely been funded by intercompany debt.

30.     Further, GunUp has filed additional litigation seeking to recover from all of the Debtor's current and former directors in connection with the assertions directly at issue in the GunUp litigation. While these individuals are no longer directors of the Debtor, they continue to serve important roles for the Non-Debtor Subsidiaries. This harassing litigation—rather than simply prosecuting the appeal that is already pending—has harmed the Non-Debtor Subsidiaries, and

devalued the Debtor's equity interests therein. As a result, currently, the Debtor's incoming revenue stream from its equity interests in the Non-Debtor Subsidiaries are no longer sufficient to sustain the Debtor's prosecution of the appeal of the GunUp litigation. For these reasons, the Debtor sought bankruptcy protection so it may obtain post-petition funding in order to preserve the value of the Debtor's business operations in the ordinary course as well as to fund the appeal, which if successful, would reduce, if not eliminate, substantially all of the Debtor's non-intercompany debt.

### First Day Motions

31.     The Debtor filed the First Day Motions contemporaneously herewith to ensure that the Debtor's business continues to function during the Cases. For the reasons set forth below, the relief requested in the First Day Motions is necessary to (i) stabilize the Debtor's business operations, (ii) operate with minimal disruption during the pendency of the Cases, (iii) maintain value as a going concern, and (iv) facilitate the efficient and economical administration of the Cases. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.[3]

**A. DIP Motion**

32.     Pursuant to the DIP Motion, the Debtor requests entry of interim and final orders authorizing the Debtor to enter into a senior secured super-priority credit facility in the aggregate amount not to exceed $500,000 substantially on the terms set forth in the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement between the Debtor and Gemini Direct Investments, LLC, (b) modifying the automatic stay to the extent applicable and (c) granting related relief.

33.     The Debtor proposes to enter into the DIP Financing in order to fund the administration of its Bankruptcy Case, the appeal, and its reorganization, solely in accordance with the DIP Budget. The DIP Financing will provide the Debtor with up to $500,000 to fund necessary operations of the

---

[3] Capitalized terms used but not otherwise defined in this Section shall have the meanings ascribed to them in the applicable First Day Motion.

8

Debtor and to administer this Bankruptcy Case through a successful reorganization of the Debtor's assets. Without such funding, the Debtor would have to cease operations and lose substantial value to the detriment of all creditors.

34.     I believe that the relief requested in the DIP Motion is in the best interests of the Debtor's estate, creditors, and all other parties in interest, and will enable the Debtor to continue to manage its business operations in chapter 11 without disruption. Accordingly, I respectfully submit that the DIP Motion should be approved.

### B. Wage Motion

35.     The Debtor requests entry of an interim and final order, authorizing but not directing the Debtor, in its discretion, as deemed necessary to continue to operate and preserve value, to (i) pay all prepetition wages, salaries, and compensation and related administrative and incidental costs and prepetition employee benefits; (ii) pay all employment, unemployment, Social Security, and federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtor to governmental authorities, and make other payroll deductions, including but not limited to retirement and other employee benefit plan contributions, expense reimbursement and voluntary deductions; and (iii) honor and continue the Debtor's prepetition programs, policies, and practices as described in the Wage Motion with respect to the Prepetition Employee Obligations (as defined in the Wage Motion) in the ordinary course of business.

#### The Debtor's Employees

36.     The Debtor's full-time employees include nine (9) employees who are salaried (the "Employees"), of whom one (1) is a senior executive[4].

---

[4] The Executive is Jeff Siegel, the Debtor's CEO.

**Wages, Salaries, and Related Obligations**

37. Before the Petition Date and in the ordinary course of business, the Debtor typically paid Employee Compensation Obligations bi-monthly on the 15th and the last day of the month. The Debtor's payroll processor, Adams Keegan, receives funds directly from the Debtor's operating account two to three days before pay day via ACH. Employees receive pay via direct deposit.

38. The Debtor estimates that, as of the Petition Date, it has approximately $89,721.53 outstanding in total accrued prepetition Employee Compensation Obligations, all of which will become due and owing before the final hearing on this motion. The Debtor believes that, as of the Petition Date, there are no employees who are individually owed wages greater than the $13,650 cap established by section 507(a)(4) of the Bankruptcy Code.

**Payroll Taxes**

39. The Debtor withholds funds from employees' wages and salaries and also makes certain payments from its own funds on account of Payroll Taxes. As of the Petition Date, the Debtor estimates that it owes approximately $2,541.30 in Payroll Taxes, including amounts owed by the Debtor and amounts withheld from employees and not yet remitted, all of which will become due and owing before the final hearing on the Wage Motion.

**Commissions**

40. Before the Petition Date, the Debtor paid its salespeople commissions (the "Commissions") based on sales, paid in arrears 15 days after the close of the prior month. By this motion, the Debtor seeks authority to continue and make payments of the Commissions (to the extent the performance measures or other qualifications for such payments have been achieved) in the ordinary course and in accordance with section 503(c) of the Bankruptcy Code for calendar years after 2020.

**Leave Policies**

41.     The Debtor offers its employees other forms of compensation, including vacation days, holidays, civic duties leave, and bereavement days. These forms of compensation are, in certain cases, required by statute, and in all cases, usual, customary, and necessary if the Debtor is to retain qualified employees to operate its business. Failure to provide these benefits could contravene applicable law and harm employee morale and encourage the premature departure of employees. The Debtor therefore requests authority to continue these programs in the ordinary course of business during this chapter 11 case.

**(a)     Vacation Days**

42.     Prior to the Petition Date, the Debtor offered its employees two weeks paid leave for the first 5 years of employment and three weeks paid between 5 and 10 years. The Debtor does not permit employees to accrue vacation. If not taken during the current calendar year or prior to termination, vacation does not carry over and cannot be "cashed out".

**(b)     Bereavement Leave and Civic Duties**

43.     With some exceptions, employees are entitled to take paid bereavement leave in the event of the death of an immediate family member. In addition, employees who are obligated to perform certain civic duties, including jury duty, are granted leave to fulfill such obligations.

**(c)     Holiday Pay**

44.     The Debtor provides paid time off for the following holidays: New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving, and Christmas Day.

**Expense Reimbursements**

45.     In the ordinary course of its business, the Debtor reimburses employees for expenses incurred on behalf of the Debtor's business.  As of the Petition Date, the Debtor estimates that approximately $23,084 in expense reimbursement obligations remain due and outstanding.

**Health and Welfare Benefits**

46.     Prior to the Petition Date, the Debtor offered its Employees various health and welfare benefits.  For medical, dental, vision, life, disability, and flexible spending: Employees are eligible to enroll on the first of the month following the first month of employment (i.e. – Start date is February 2nd, benefit eligibility is March 1st).

**Medical and Dental Plans**

47.     Company contributes $300.00 per month towards the Employee's medical insurance premium.  Three plans are offered:  HMO, POS and PPO. Employee premiums are deducted pre-tax. For Employee's dental insurance, the Debtor also contributes up to $32.84 of the Employee's total premium per month.

**Other Benefit Programs**

48.     The Debtor also offers a flexible spending plan. By law, Flexible or Dependent Care Spending funds are "use it or lose it". The company does not hold any of the monies contributed to the flexible spending plan by Employees. Funds are managed by Adams Keegan and the funds are held at Eflex Group.

**401(k) Plans**

49.     The Debtor also offers a 401(k) plan to its Employees. Employees are eligible to contribute on the first of the month following six months of employment. The Debtor makes a 3% contribution to an Employee's account once the eligibility date is reached.

50.     The Debtor estimates that before the final hearing on the Wage Motion, Prepetition Employee Obligations totaling approximately $89,721.53 will be due and payable. To fulfill these imminent commitments, the Debtor requests entry of the Interim Order, authorizing the Debtor to pay Prepetition Employee Obligations in an aggregate amount not to exceed the Interim Amount (as

defined in the Wage Motion), subject to the $13,650 per-employee cap established by sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

51. Further, the Debtor requests that this Court authorize all applicable banks and other financial institutions to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtor's bank accounts before the Petition Date for Prepetition Employee Obligations (or to reissue checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtor's bank accounts, as may be necessary), and authorize the banks and financial institutions to rely on the Debtor's representations as to which checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtor's bank accounts are subject to this motion; *provided that* sufficient funds are on deposit in the applicable bank accounts to cover such payments.

52. I believe that the relief requested in the Wage Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to manage its business in chapter 11 without disruption. Accordingly, I respectfully submit that the Wage Motion should be approved.

### C. Critical Vendor Motion

53. The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay the prepetition claims of certain vendors that are critical to the Debtor's operations, as more fully described herein (the "Critical Vendors") up to $193,925.19 on an interim and final basis.

54. As a result of the Debtor's vetting process, the Debtor has identified fifteen (15) Critical Vendors, which the Debtor estimates are owed approximately $193,925.19 as of the Petition Date. The Critical Vendors provide the following services which are especially important given the Debtor's very limited staff and the additional burdens put on such staff as a result of the commencement of this Chapter 11 Case:

- **Publishers.** Publishers are websites that attract specific users through the creation of targeted, expert content. This content can be monetized by Media Lodge to very specific advertisers seeking these users. Typically, these websites have spent years building their unique audience through promotion and custom content. These publishers are incredibly unique since their contributors (writers, content creators, photographers) have a very specific expertise in their field (a blend of engineering, military duty, product expertise, etc.) which are not widely available. Media Lodge has spent years searching for these publishers with the specific goal of attracting these targeted audiences to deliver to the Media Lodge advertisers.
- **Writers.** Much like publishers, our writers have a very specific skill set and knowledge base designed to reach users on our owned websites. Typically, these writers have years of experience in their respective field.
- **Producers.** Much like writers and publishers, our producers have a very specific skill set and knowledge base designed to reach users on our owned websites. Typically, these producers have years of experience in their respective field. Additionally, they have specific gear, equipment and facilities to showcase these products for our advertisers.
- **Ad agencies.** Much like writers and publishers, our ad agencies have a very specific skill set and knowledge base which they use to create and design specific ads for our users. They have legal knowledge and technical knowhow that uniquely suits them in the firearms industry.

55. The Debtor believes that if it cannot continue the relationships with the Critical Vendors, it may be impossible to continue doing business.

56. The amount of capital required to obtain similar goods or comparable services (if at all possible after a default) would be much greater than the combined total of making payment on the past due amounts to the Critical Vendors and the likely payment required for postpetition work.

57. The Debtor believes it must continue to receive the services provided by the Critical Vendors in order to achieve a successful reorganization. In some cases, the Debtor believes that absent

payment of prepetition amounts due Critical Vendors may refuse to deliver any goods and services on an on-going basis even if the Debtor can pay postpetition amounts due.

58. Ultimately, the Debtor believes that its ability to continue operations at the efficient and high-quality levels needed to reorganize successfully will largely depend on the continued participation of the Critical Vendors. The Debtor, along with its restructuring advisors, has performed an analysis of the Critical Vendor Payments necessary to avoid potentially significant disruptions to the Debtor's business operations. The Debtor believes that a fund of $193,925.19 in the aggregate should provide the flexibility necessary for the Debtor to receive the vital goods and/or services they require to continue being successful as a reorganized entity.

### D. Cash Management Motion

59. As of the Petition Date, the Debtor maintained one account with Bank of America (the "Bank") account number XXX-XXX-XX8-351.

60. The account was garnished and $64,080.74 in funds removed on October 23, 2020. The account has a current negative balance of $1,111.41.

61. The Debtor seeks authority to continue using the existing Bank Account described above, subject to the Debtor's right to close the Bank Account in its discretion and in accordance with any approved postpetition financing.

62. The United States Trustee for the District of Delaware has set forth certain operating and reporting requirements for chapter 11 Case (the "U.S. Trustee Guidelines") that require Debtor in possession to, among other things: (a) establish one debtor in possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (b) close all existing bank accounts and open new debtor in possession accounts; (c) maintain a separate debtor in possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks.  These requirements

are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, and to help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

63. Enforcement of the U.S. Trustee Guidelines during this Case would severely disrupt the Debtor's ordinary financial operations. Accordingly, the Debtor respectfully requests that the Court allow the Debtor to operate the Bank Account as such was maintained in the ordinary course of business before the Petition Date.

64. In addition, the Debtor concurrently filed certain motions seeking authorization to pay prepetition obligations in the ordinary course of business. If the Debtor were required to open a new account, the Debtor would likely be unable to timely implement the critical relief sought in those motions. The Debtor has the ability to monitor disbursements from the Bank Account to ensure that only those prepetition obligations expressly approved by this Court are paid.

65. In the ordinary course of business, the Debtor uses certain pre-printed check stock. To avoid disruption of its business and unnecessary expense, pursuant to Local Rule 2015-2(a), the Debtor requests that it be authorized to continue to use existing check stock, without reference to its status as debtor in possession. The Debtor submits that parties in interest will not be prejudiced if the Debtor is authorized to continue to use the existing checks. The Debtor will send a notice of commencement of this chapter 11 case to all creditors. Most parties doing business with the Debtor undoubtedly will be aware of its status as debtor in possession; thus, changing checks immediately is unnecessary and unduly burdensome.

66. The Debtor requests that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtor to make all disbursements by check. In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must

be made by check with a notation representing the reason for the disbursement. In the ordinary course of business, the Debtor conducts transactions through ACH payments and other similar methods. If the Debtor's ability to conduct transactions by debit, wire, ACH payment, or other similar methods is impaired, the Debtor may be unable to perform under certain contracts, its business operations may be unnecessarily disrupted, and its estate will incur additional costs. As such, the Debtor should be permitted to continue using debit, wire, and ACH payments.

67. The Debtor respectfully requests that the Court authorize the Bank to continue to maintain, service, and administer the Bank Account as accounts of the Debtor as debtor in possession, without interruption and in the ordinary course of business. In this regard, the Bank should be authorized and directed to receive, process, honor, and pay any and all checks, ACH payments and other instructions, and drafts payable through, drawn, or directed on the Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto.

I declare under penalty of perjury that, to the best of my knowledge after reasonable inquiry, the foregoing is true and correct.

Dated: 11/10, 2020

_____
Jeff Siegel