**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MEDIA LODGE, INC., | ) | Case No. 20-12969 (JTD) |
| | ) | |
| Debtor. | ) | |
| | ) | |

### DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); (B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C § 362; AND (C) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Media Lodge, Inc., the above-captioned debtor and debtor-in-possession (the "***Debtor***" or "***Borrower***"), by and through its undersigned counsel, hereby moves the Court (the "***Motion***") pursuant to sections 105(a), 361, 362, 364, and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 4001-2 of the Local Rules of Bankruptcy Procedure for the District of Delaware (the "***Local Rules***") for entry of interim and final orders authorizing the Debtor to enter into a senior secured super-priority credit facility in the aggregate amount not to exceed $500,000 (the "***DIP Financing***") substantially on the terms set forth in the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement between the Debtor and Gemini Direct Investments, LLC ("**GDI**" or "***DIP Lender***"), annexed hereto as **Exhibit A** (as amended, supplemented, or otherwise modified and in effect from time to time, the "***DIP Term Sheet***" and, together with any and all schedules thereto and other related documents and agreements entered into in connection with or related to the DIP Financing, the "***DIP Loan Documents***"), (b) modifying the automatic stay to the extent applicable, (c) granting related relief, and (d) scheduling

a final hearing pursuant to Rule 4001 of the Bankruptcy Rules. In support of this Motion, the Debtor respectfully states as follows:

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is core within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 364, and 507 of the Bankruptcy Code, and the procedural predicates are Rules 2002, 4001, and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

**BACKGROUND**

**A.      Procedural Background**

3.      On the date hereof (the "***Petition Date***"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

**B.      Overview of the Debtor's Business**

5.      Debtor is an advertising brokerage.  Website owners contract with Debtor to sell advertising space on their websites and related media.  In exchange, Debtor remits a share of the advertising revenue, plus management fees.  In large part, the advertisements are in the form of banner advertisements—ads in the form of images.

6.      Debtor was created in 2014 to manage the sale of advertising on GunBroker.com, and it has the exclusive right to sell advertising on that website.  Debtor and GunBroker.com are sister companies; GunBroker.com is owned by IA Tech, LLC ("***IA Tech***"), and, before the merger with Defendant, IA Tech was also Debtor's sole owner.  GunBroker.com is the world's largest online-auction website for firearms and hunting and shooting gear.  Until 2015, Debtor placed advertisements only on GunBroker.com.  Following a restructuring of the Debtor's operations in May 2019, TVP Investments LLC became the Debtor's owner.[1]

7.      The Debtor has two wholly-owned subsidiaries:  Media Lodge, LLC ("***LLC Sub***") and GunUp, LLC ("***Acquisition Sub***," and with LLC Sub, the "***Non-Debtor Subsidiaries***").  LLC Sub is a non-debtor entity that holds the contracts with 3rd party publishers and partners for which the Media Lodge organization sells advertising.  Acquisition Sub is a non-debtor entity that sells advertising for in-house and 3rd party web sites, social media, email lists and other media.

## C.      The Debtor's Pre-Petition Capital Structure

8.      As of the Petition Date, the Debtor was also indebted to the DIP Lender who is an affiliate of the Debtor, pursuant to that certain Secured Promissory Note dated March 31, 2015 originally between the Debtor and IA Tech in the aggregate amount of $9,382,132 with respect to

---

[1] A portion of the Debtor's shares are at issue in the Washington Action discussed below, where the state court granted rescission of the merger agreement and entered judgment against the Debtor that includes the dollar value attributed by the state court to those shares.  That judgment is subject to an appeal filed by the Debtor, and the resolution of that appeal could affect the status of the shares originally issued to GunUp, Inc in connection with the merger.

intercompany obligations (the "**Pre-Petition Debt" or "*Intercompany Debt***"). Of the Pre-Petition Debt, $2 million is secured by a security interest in substantially all of the Debtor's assets as set forth in the Secured Promissory Note dated March 31, 2015, between IA Tech, LLC and since assigned to GDI. The remainder of the debt is unsecured.

9.      In addition, as of the Petition Date, the Debtor's other major creditor was GunUp, Inc. ("*GunUp*"), to whom the Debtor is obligated on a judgment in the face amount of $2,478,990.77 (the "*Judgment*") issued by the Superior Court for the State of Washington in and for King County in Case No. 16-2-15005-5 SEA (the "*Washington Action*"). The Debtor disputes the court's findings in the Washington Action and has appealed the Judgment.

10.     The Debtor's remaining obligations constitutes unsecured debt of approximately $242,000 owed to trade creditors.

**D.      The Debtor Needs an Infusion of Cash**

11.     Since the filing of the Washington Action, despite a positive cash flow for its ongoing operations, the Debtor has been cash flow negative, as legal fees and other litigation costs have far exceeded the Debtor's assets, which primarily consist of its equity interests in the Non-Debtor Subsidiaries. These excess costs have largely been funded by the Intercompany Debt. The Debtor continues to need a significant cash infusion in order to continue to prosecute its appeal of the Judgment, which the Debtor believes will be successful.

12.     In addition, GunUp's vexatious actions since the Debtor filed the appeal are now causing direct harm to the Debtor's business. In particular, GunUp has filed a garnishment action against one of LLC Sub's major creditors seeking to recover the Judgment. LLC Sub was not a party to the Washington Action and has no liability on the Judgment. These actions have directly

and substantially harmed the Debtor because it owns 95% of LLC Sub, and LLC Sub has lost at least one major customer as a result of the garnishment action.

13.     Likewise, GunUp has filed additional litigation seeking to recover from all of the Debtor's current and former directors in connection with the assertions directly at issue in the Washington Litigation.  While these individuals are no longer directors of the Debtor, they continue to serve important roles for the Non-Debtor Subsidiaries.  This harassing litigation— rather than simply prosecuting the appeal that is already pending—has harmed the Non-Debtor Subsidiaries, and devalued the Debtor's equity interests therein.  As a result, currently, the Debtor's incoming revenue stream from its equity interests in the Non-Debtor Subsidiaries are no longer sufficient to sustain the Debtor's prosecution of the appeal of the Washington Action.  For these reasons, the Debtor will need the additional funds to preserve the value of the Debtor's business operations in the ordinary course as well as to fund the appeal, which if successful, would reduce, if not eliminate, substantially all of the Debtor's non-intercompany debt.

14.     Prior to Petition Date, the Debtor, in consultation with its advisors, reviewed and analyzed its projected cash needs and prepared the budget set forth as **Exhibit C** (the "*Budget*"), outlining the Debtor's postpetition cash need in the initial thirteen weeks of the Bankruptcy Case. The DIP Financing will provide the Debtor with the long-term liquidity necessary to, among other things, make payroll and satisfy its other working capital and general corporate purposes, including essential payments to vendors and service providers that are necessary to preserve the value of the Debtor's estate.

**E.      The Proposed DIP Financing**

15.     The Debtor proposes to enter into the DIP Financing in order to fund the administration of its Bankruptcy Case, the appeal, and its reorganization, solely in accordance with

the Budget.  The DIP Financing will provide the Debtor with up to $500,000 to fund necessary operations of the Debtor and to administer this Bankruptcy Case through a successful reorganization of the Debtor's assets.  Without such funding, the Debtor would have to cease operations and lose substantial value to the detriment of all creditors.

16.    Pursuant to Rule 4001 of the Bankruptcy Rules and Rule 4001-2 of the Local Rules, the principal terms of the DIP Term Sheet[2] are as follows:

| | |
|---|---|
| **_Borrower:_** | Media Lodge, Inc. ("**_Media Lodge_**" or "**_Borrower_**"), as a debtor and debtor-in-possession in a case (the "**_Case_**") pending as of the filing date (the "**_Filing Date_**") under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq., "**_Bankruptcy Code_**") in the United States Bankruptcy Court for the District of Delaware ("**_Bankruptcy Court_**"). |
| **_Lenders and Agent:_** | Gemini Direct Investments, LLC (the "**_Lender_**"). |
| **_Financing Facility:_** | A super-priority, senior secured, debtor-in-possession credit facility with a maximum credit amount ("**_Maximum Amount_**") of $500,000, with $150,000 available on an interim basis (the "**_Facility_**"). |
| **_Availability under Facility:_** | Draws under the Facility ("**_Draws_**") would be available up to the Maximum Amount. |
| | The Borrower would only be permitted to request Draws to the extent required to pay, when due, those expenses enumerated in the Budget (defined below). |
| **_Use of Proceeds:_** | To (i) finance the ongoing general corporate needs of Borrower to the extent set forth in the Budget, and (ii) pay for administrative expenses incurred during the Case and set forth in the Budget. |
| **_Fees and Interest Rates for Facility:_** | No fees. |
| | Interest rate of five (5%) percent calculated on a 360 day year and actual days elapsed. |
| **_Term of Facility:_** | Repayment on earlier of (1) 180 days from the Filing Date, (2) a sale of all the Debtor's assets, (3) effective date of a plan (unless a plan is confirmed that requires repayment on other |

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Term Sheet. To the extent there is any inconsistency between the description of the DIP Financing in this Motion and the terms of the DIP Loan Documents themselves, the DIP Loan Documents shall control.

terms), (4) dismissal of the case, (5) conversion to chapter 7, (6) the appointment of a trustee, or (7) conversion from subchapter V of chapter 11 ("**_Maturity Date_**").

**_Collateral under ABL Facility:_**

Subject to the Carve-Outs (as defined below), all Obligations of the Loan Parties to Agent and Lenders shall be secured by all real and personal property of Borrower (the "**_Collateral_**"), including, effective upon entry of a Final Order (defined below), all causes of action and proceeds thereof under chapter 5 of the Bankruptcy Code.

All obligations of the Loan Parties in respect of the ABL Facility shall be (i) entitled to super-priority administrative expense claim status pursuant to § 364(c)(1) of the Bankruptcy Code with priority over all administrative expenses of the kind that are specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code ("**_Superpriority Claims_**"), subject to the Carve-Outs; and (ii) secured, pursuant to §§ 364(c)(2) and (c)(3) and § 364(d) of the Bankruptcy Code by a security interest and lien on the Collateral, subject to the Carve-Outs.

**_Budget:_**

As used herein, "**_Budget_**" means the following:  an operating budget setting forth the projected financial operations of the Borrower, which budget shall be in form and substance satisfactory to the Lender and shall in any event include available cash, cash flow, trade payables, total expenses and capital expenditures and projected Availability during the term of the Facility.  The Budget will be updated weekly during the continuance of the Case to the extent approved by Lender.

**_Budget Compliance under Facility:_**

Measured, on a cumulative basis, as of the last day of the first full week after the Filing Date and the last day of each week thereafter through, and including, the fourth week and, with respect to each week after the fourth week, on a trailing four-week basis, (i) post-petition disbursements may not exceed 110% of Budgeted disbursements during the applicable Budget period, (ii) post-petition receipts may not be less than 90% of Budgeted receipts during the applicable Budget period, and (iii) post-petition sales may not be less than 90% of Budgeted sales during the applicable Budget period.

**_Carve-Outs:_**

The liens of the Lender and the Superpriority Claims shall be subject to a carve-out (the "**_Carve-Out_**"), which shall (i) be the lesser of the amount set forth in the Budget for the period from the Filing Date to the Carve-Out Termination Date and the amount of allowed fees and expenses that accrue during such period, (ii) be reduced by payments made to the applicable professionals and (iii) be paid first out of any prepetition retainer.  After the Carve-Out Termination Date, Lenders will

provide to Borrower in an amount equal to the Carve-Out amount set forth in the immediately preceding sentence <u>plus</u> $10,000 (to be used for the sole purpose of funding the applicable professionals after the Carve-Out Termination Date, subject to the terms of the Orders (as defined below)).

The "***Carve-Out Termination Date***" shall mean the earliest of (x) the occurrence of a default or event of default under the Facility and notification to Borrower of such default or event of default, (y) the date on which the any existing obligations have been Paid in Full and (z) the Maturity Date.

|  |  |
| --- | --- |
| ***Events of Default under Facility:*** | The credit agreement governing the Facility would include usual and customary events of default for financings of this type, including, without limitation, (1) failure to repay the Loan within 180 days from the Filing Date, (2) a sale of all the Debtor's assets, (3) dismissal of the case, (4) conversion to chapter 7, (5) the appointment of a trustee, (6) obtaining financing from any entity or person other than the Lender, or (7) conversion from subchapter V of chapter 11. |
| ***Assignments under ABL Facility:*** | Lender would be permitted to assign its rights and obligations under the loan documents, or any part thereof, to any person or entity without the consent of Borrower. |
| ***Governing Law and Forum under Facility:*** | Delaware. |

## RELIEF REQUESTED AND BASIS THEREFOR

17.    By this Motion, the Debtor seeks entry of two orders.  First, the Debtor requests entry of an interim order, in substantially the form attached hereto as **Exhibit B** (the "***Interim Order***"), (a) authorizing the Debtor to enter into the DIP Financing and grant the DIP Lender the liens and super-priority claims described herein, (b) modifying the automatic stay to the extent applicable and necessary, and (c) scheduling a final hearing (the "***Final Hearing***") pursuant to Rule 4001 of the Bankruptcy Rules. Second, the Debtor requests entry of a final order (the "***Final Order***," and together with the Interim Order, the "***DIP Orders***") authorizing the relief granted in the Interim Order on a permanent basis.

18.     The Debtor has insufficient cash with which to operate its business long term or to protect its assets.  It has insufficient money to conduct a reorganization or a sale process, and believes that the value of its assets will rapidly diminish if the case does not quickly conclude. Thus, the Debtor needs the DIP Financing to maintain its business pending the confirmation of a plan of reorganization or the closing of a sale in order to maximize the value of its assets for the benefit of all of its creditors.  The Debtor has negotiated with the DIP Lender to present this Motion on a consensual basis in order to expedite the process and achieve the highest value possible for creditors.

19.     Thus, the Debtor believes that, in its business judgment, entry into the DIP Term Sheet is in its best interests.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds*, 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").  As such, this Court should authorize the Debtor to enter into the DIP Financing.

A.  **The DIP Financing Should be Approved Under Section 364 of the Bankruptcy Code**

20.  Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

21.  Courts consider various factors in determining whether obtaining post-petition financing pursuant to section 364(c) is appropriate, including whether (1) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim; (2) the credit transaction is necessary to preserve the assets of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate under the circumstances. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed post-petition financing) (citations omitted); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

22.  In addition, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur post-petition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." *See* 11 U.S.C. § 364(d)(1); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010).

1.      **The Debtor is Unable to Obtain Unsecured Credit**

23.     The Debtor urgently requires long-term working capital financing in order to preserve and maintain its business during the Bankruptcy Case.  Gun-Up's aggressive litigation tactics against the Debtor's affiliates, directors, and customers has left the Debtor with insufficient revenue to fund its continuing obligations and the costs of continuing its appeal of the Judgment.  Gun-Up's actions have devalued the Debtor's business at the expense of its other creditors.  Given the ongoing litigation, the only parties potentially interested in providing funding to the Debtors are its owners.  Indeed, the Debtor's obligations and litigation costs in connection with the Washington Action over the past several years have been funded through the Intercompany Debt.

24.     The Intercompany Debt is already unsecured to the extent of nearly $8 million, and none of the Debtor's affiliates are willing to lend further on an unsecured basis.  The DIP Lender is the only party that has offered to discuss and negotiate the terms of financing, and is unwilling to provide DIP Financing on an unsecured basis.  As such, the Debtor has determined that it is unable to obtain critical post-petition financing on an unsecured basis.

2.      **The Transaction Under the DIP Loan Documents is Necessary
        to Preserve the Estate and is in the Best Interests of Creditors**

25.     The Debtor has insufficient cash with which to operate its business long-term or protect its assets.  Without access to post-petition financing, the Debtor will be unable to reorganize its business, which would significantly impair the value of the Debtor's assets and jeopardize the Debtor's ability to reorganize to the detriment of all creditor constituencies.

26.     By obtaining the DIP Financing, the Debtor will be in a position to preserve the value of its assets during the chapter 11 case – specifically, the infusion of capital will prevent the value of the Debtor's assets from plummeting and give the Debtor sufficient time to reorganize.

The DIP Financing will permit it to continue to pay its bills during the pendency of this Bankruptcy Case.

27.    Absent approval of the relief sought herein, the Debtor faces a substantial risk of irreparable damage to the value of its assets and the probability of conversion of the Bankruptcy Case to a case under chapter 7.  *See In re Sun Healthcare Group, Inc.*, 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates").  Accordingly, the Debtor needs sufficient liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the detriment of all creditors.

**3.    The Terms of the DIP Financing are Fair and Reasonable.**

28.    In determining whether the terms of post-petition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.  *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

29.    Under the circumstances of this case, including the Debtor's dire financial condition, the need to prosecute the Debtor's appeal of the Washington Action, and the lack of readily available financing, the terms of the DIP Financing are fair and reasonable.  First, the terms and conditions of the DIP Term Sheet were negotiated by the parties in good faith and at arms' length and were instituted for the purpose of enabling the Debtor to meet ongoing operational expenses while in chapter 11 and preserving the value of the Debtor's assets.  Second, the terms themselves are reasonable and favorable to the Debtor.  There is no fee for the DIP Financing, the

interest rate is very favorable to the Debtor, and the DIP Loan does not try to convert the DIP Lender's pre-petition unsecured claims into administrative claims.

30.     Furthermore, the DIP Financing subjects the security interests and administrative expense claims granted to the DIP Lender to the Administrative Carve Out for certain administrative and professional fees, including (i) fees required to be paid to the Court and to the United States Trustee, and (ii) the reasonable fees and expenses incurred by the professionals of (a) the Debtor, (b) the subchapter V trustee, and (c) any unsecured creditor's committee, subject to the agreed upon Budget.  Carve-outs for professional fees have been found to be reasonable and necessary to ensure that statutory creditor's committees and debtors' estates are adequately assisted by counsel and other professionals.  *See In re Ames*, 115 B.R. at 38.  Accordingly, the terms of the DIP Financing are fair and reasonable.

31.     As such, the DIP Financing should be approved under section 364(c) of the Bankruptcy Code.

### 4.     Priming of the Intercompany Debt

32.     Generally, in order for a debtor to incur post-petition debt on a senior or "priming" basis, it must provide adequate protection to the lienholder whose lien is being primed.  11 U.S.C. § 364(d)(1).  Preservation of value generally constitutes the "adequate protection" needed to prime existing liens.  *See, e.g.*, *Bray (In re Snowshoe Co. Inc.)*, 789 F.2d at 1087 (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of its fair market value if it ceased operations"); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631 (finding that funds from lender given "priming" lien used to improve collateral will be transferred into value "[that] will serve as adequate protection. . . ."); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).  Consent by the secured creditors to priming obviates the need

to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Here, the Prepetition Secured Lender has consented to the priming of its security interest.

**B.**   **The DIP Financing Was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code.**

33.    Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

34.    Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).  Additionally, "[g]ood faith is measured with respect to the good faith of the lender as contrasted to that of the borrower." *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009).  Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees and to protect pre-petition positions are understandable and acceptable motivations for a post-petition lender in negotiating a deal. *Id.*

35.    The terms of the DIP Financing were negotiated at arm's length and reflect the most advantageous terms available to the Debtor in light of the exigent circumstances it faces. The DIP Financing is being extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party to the

DIP Loan, other than as set forth herein and in the Interim Order.  As such, the DIP Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**C.**    **The Automatic Stay Should Be Modified on a Limited Basis.**

36.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.  Stay modification provisions of this sort are ordinary and usual features of debtor-in-possession financing facilities and are reasonable under the present circumstances.

37.    The Debtor further requests that, upon the occurrence of an Event of Default under the DIP Term Sheet, the automatic stay be immediately vacated to permit the DIP Lender to exercise all rights and remedies under the DIP Loan Documents or the DIP Orders, as applicable, without further action or order of the Bankruptcy Court.  However, the DIP Lender will be entitled to exercise all of its rights and remedies under the DIP Loan Documents only upon three business days' written notice to the Borrower.  Such relief is an appropriate balance, providing the DIP Lender with the ability to exercise its rights upon the Debtor's Event of Default without having to seek further relief from the Court, while simultaneously providing the Debtor with notice and the opportunity to seek reinstatement of the automatic stay.

**D.**    **Approval of the DIP Financing on an Interim Basis is**
      **Necessary to Prevent Immediate and Irreparable Harm.**

38.    Rule 4001(c)(2) of the Bankruptcy Rules governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).  "Immediate and irreparable harm" exists where loss of the business threatens the ability of the debtor to reorganize.  *See In re Ames*, 115 B.R. at 36 n.2. Approval of a DIP facility on an interim basis under Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case. *See In re Pan Am Corp.*, 1992 WL 154200 *1, *6 (S.D.N.Y. June 18, 1992).

39.      Absent authorization from this Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed. While the Debtor currently has cash sufficient to meet its immediate cash needs, that cash is expected to run out shortly.  The Debtor needs to obtain immediate access to liquidity under the DIP Financing in order to, among other things, continue the operation of its business, maintain relationships with customers, make payroll, and satisfy other working capital and operational needs.  Thus, the credit provided under the DIP Financing will enable the Debtor to continue to operate its business in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest.

40.      The availability of interim funding under the DIP Term Sheet will also provide necessary assurance of the Debtor's ability to meet its near-term obligations and encourage creditors, employees, contract counterparties and customers to continue its relationships with the Debtor.  Failure to meet these obligations and to provide these assurances will cause creditors, customers, contract counterparties and employees to lose confidence in the Debtor, thereby causing irreparable harm to the value of the Debtor's business and assets.

41.     Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor's assets for the benefit of all parties.  As such, the Debtor believes that, under the circumstances, entry of the Interim Order is necessary to prevent immediate and irreparable harm to the estates and therefore is warranted under the requirements of Bankruptcy Rule 4001(c)(2).

**E.      Request for a Final Hearing**

42.     Pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, the Debtor requests that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 30 days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this Motion.

**REQUEST FOR RELIEF UNDER BANKRUPTCY RULE 6004(h)**

43.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Given the nature of the relief requested herein, the Debtor respectfully requests a waiver of the 14-day stay under Bankruptcy Rule 6004(h) so that the Interim Order on this Motion may be effective immediately.  As set forth above, the Debtor needs immediate access to funding under the DIP Financing in order to prevent irreparable damage to the Debtor's business and to preserve the value of its assets.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

**NOTICE**

44.     Notice of this Motion will be provided to the following parties: (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel for the DIP Lender, (iii) the Debtor's 20 largest creditors, (iv) the Internal Revenue Service; (v) the United States Attorney's

Office for the State of Delaware; and (iv) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002).

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that this Court enter the Interim Order, substantially in the form attached hereto as **Exhibit B**, (a) authorizing the Debtor to enter into the DIP Financing and grant the DIP Lender the liens and super-priority claims described herein, (b) modifying the automatic stay to the extent applicable and necessary, (c) scheduling the Final Hearing pursuant to Bankruptcy Rule 4001, and (d) granting such other and further relief as this Court deems appropriate.

Dated: November 10, 2020

GELLERT SCALI BUSENKELL & BROWN LLC

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
Ronald S. Gellert (DE 4259)
1201 North Orange Street, 3rd Floor
Wilmington, DE 19801
302-425-5800
mbusenkell@gsbblaw.com
rgellert@gsbblaw.com

*Proposed Counsel to Debtor and Debtor-in-Possession*

**<u>Exhibit A</u>**
**DIP Term Sheet**

## DEBTOR-IN-POSSESSION
## FINANCING TERM SHEET

**The contents of this term sheet are for discussion purposes only, represent settlement discussions, and are subject to Federal Rule of Evidence 408. This letter is non-binding and does not summarize all potential terms or conditions that may apply to any such transactions, and this term sheet does not constitute an agreement, a commitment, a contract to provide a commitment, or an offer to enter into any contract to consummate any of the transactions described herein.**

| | |
|---|---|
| ***Borrower:*** | Media Lodge, Inc. ("***Media Lodge***" or "***Borrower***"), as a debtor and debtor-in-possession in a case (the "***Case***") pending as of the filing date (the "***Filing Date***") under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq., "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware ("***Bankruptcy Court***"). |
| ***Lenders and Agent:*** | Gemini Direct Investments, LLC (the "***Lender***"). |
| ***Financing Facility:*** | A super-priority, senior secured, debtor-in-possession credit facility with a maximum credit amount ("***Maximum Amount***") of $500,000, with $150,000 available on an interim basis (the "***Facility***"). |
| ***Availability under Facility:*** | Draws under the Facility ("***Draws***") would be available up to the Maximum Amount.<br><br>The Borrower would only be permitted to request Draws to the extent required to pay, when due, those expenses enumerated in the Budget (defined below). |
| ***Use of Proceeds:*** | To (i) finance the ongoing general corporate needs of Borrower to the extent set forth in the Budget, and (ii) pay for administrative expenses incurred during the Case and set forth in the Budget. |
| ***Fees and Interest Rates for Facility:*** | No fees.<br><br>Interest rate of five (5%) percent calculated on a 360 day year and actual days elapsed. |
| ***Term of Facility:*** | Repayment on earlier of (1) 180 days from the Filing Date, (2) a sale of all the Debtor's assets, (3) effective date of a plan (unless a plan is confirmed that requires repayment on other terms), (4) dismissal of the case, (5) conversion to chapter 7, (6) the appointment of a trustee, or (7) |

conversion from subchapter V of chapter 11 ("**_Maturity Date_**").

| | |
|---|---|
| **_Collateral under ABL Facility:_** | Subject to the Carve-Outs (as defined below), all Obligations of the Loan Parties to Agent and Lenders shall be secured by all real and personal property of Borrower (the "**_Collateral_**"), including, effective upon entry of a Final Order (defined below), all causes of action and proceeds thereof under chapter 5 of the Bankruptcy Code. |

All obligations of the Loan Parties in respect of the ABL Facility shall be (i) entitled to super-priority administrative expense claim status pursuant to § 364(c)(1) of the Bankruptcy Code with priority over all administrative expenses of the kind that are specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code ("**_Superpriority Claims_**"), subject to the Carve-Outs; and (ii) secured, pursuant to §§ 364(c)(2) and (c)(3) & § 364(d) of the Bankruptcy Code by a security interest and lien on the Collateral, subject to the Carve-Outs.

| | |
|---|---|
| **_Budget:_** | As used herein, "**_Budget_**" means the following:  an operating budget setting forth the projected financial operations of the Borrower, which budget shall be in form and substance satisfactory to the Lender and shall in any event include available cash, cash flow, trade payables, total expenses and capital expenditures and projected Availability during the term of the Facility.  The Budget will be updated weekly during the continuance of the Case to the extent approved by Lender. |
| **_Budget Compliance under Facility:_** | Measured, on a cumulative basis, as of the last day of the first full week after the Filing Date and the last day of each week thereafter through, and including, the fourth week and, with respect to each week after the fourth week, on a trailing four-week basis, (i) post-petition disbursements may not exceed 110% of Budgeted disbursements during the applicable Budget period, (ii) post-petition receipts may not be less than 90% of Budgeted receipts during the applicable Budget period, and (iii) post-petition sales may not be less than 90% of Budgeted sales during the applicable Budget period. |
| **_Carve-Outs:_** | The liens of the Lender and the Superiority Claims shall be subject to a carve-out (the "**_Carve-Out_**"), which shall (i) be the lesser of the amount set forth in the Budget for the period from the Filing Date to the Carve-Out Termination Date and the amount of allowed fees and expenses that |

accrue during such period, (ii) be reduced by payments made to the applicable professionals and (iii) be paid first out of any prepetition retainer.   After the Carve-Out Termination Date, Lenders will provide to Borrower in an amount equal to the Carve-Out amount set forth in the immediately preceding sentence <u>plus</u> $10,000 (to be used for the sole purpose of funding the applicable professionals after the Carve-Out Termination Date, subject to the terms of the Orders (as defined below)).

The "***Carve-Out Termination Date***" shall mean the earliest of (x) the occurrence of a default or event of default under the Facility and notification to Borrower of such default or event of default, (y) the date on which the any existing obligations have been Paid in Full and (z) the Maturity Date.

| | |
|---|---|
| ***Events of Default under Facility:*** | The credit agreement governing the Facility would include usual and customary events of default for financings of this type, including, without limitation, (1) failure to repay the Loan within 180 days from the Filing Date, (2) a sale of all the Debtor's assets, (3) dismissal of the case, (4) conversion to chapter 7, (5) the appointment of a trustee, (6) obtaining financing from any entity or person other than the Lender, or (7) conversion from subchapter V of chapter 11. |
| ***Assignments under ABL Facility:*** | Lender would be permitted to assign its rights and obligations under the loan documents, or any part thereof, to any person or entity without the consent of Borrower. |
| ***Governing Law and Forum under Facility:*** | Delaware. |

# **<u>EXHIBIT A TO TERM SHEET</u>**

MEDIA LODGE INC.
Proposed Budget
Cash Basis

| | | | | | | Week of | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ORDINARY INCOME / EXPENSE | 15-Nov | 22-Nov | 29-Nov | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 1/3/2021 | 1/10/2021 | 1/17/2021 | 1/24/2021 | 1/31/2021 | 2/7/2021 |
| **Income** | | | | | | | | | | | | | |
| Banner Ads - Programmatic Ads | 1 | 1 | 2 | 150 | 150 | 150 | 200 | 150 | 150 | 150 | 200 | 150 | 150 |
| Banner Exchange | 40,000 | 50,000 | 103,875 | 30,000 | 40,000 | 50,000 | 116,105 | 20,000 | 30,000 | 40,000 | 60,000 | 61,944 | 38,086 |
| Total Income | 40,001 | 50,001 | 103,877 | 30,150 | 40,150 | 50,150 | 116,305 | 20,150 | 30,150 | 40,150 | 60,200 | 62,094 | 38,236 |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| Hosting / Data Center | - | 255 | - | - | - | 264 | - | - | - | 264 | - | - | - |
| Production Costs | - | 255 | - | - | - | 264 | - | - | - | 264 | - | - | - |
| Commission | | - | - | | 39,038 | - | | - | 27,582 | - | - | - | 27,582 |
| Advertising Consult - Programmatic | 1,651 | 1,305 | 651 | | | | | | 1,238 | 1,238 | 1,238 | 1,238 | 979 |
| Publisher Costs (Bloggers) | 13,780 | | 41,340 | - | 13,780 | | 41,340 | | 13,780 | | 41,340 | | 13,780 |
| Banner Exchange | - | 640 | - | - | - | 640 | - | - | - | 640 | - | - | - |
| Ad Creation/Graphic Desogn (For Advertisers) | - | 478 | - | - | - | 478 | - | - | - | 478 | - | - | - |
| Advertising Joint Venture | - | 1,200 | - | - | - | 1,200 | - | - | - | 1,200 | - | - | - |
| Ad Operations | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 |
| Video Production | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | - |
| Video Production Get Zone | - | - | 4,557 | - | - | - | 4,557 | - | - | - | 4,557 | - | - |
| Billable Expenses | | | | | | | | | | | | | |
|    Credit Card fees | - | - | 1,062 | - | - | - | 1,062 | - | - | - | - | 1,062 | - |
|    Gateway Fees | - | - | 10 | - | - | - | 10 | - | - | - | - | 10 | - |
| Advance Retail Segmentation Expense | - | - | 56,976 | - | | | 60,000 | | | | | 60,000 | |
| Selling Costs | 22,249 | 10,441 | 116,413 | 6,818 | 59,636 | 9,136 | 118,787 | 6,818 | 49,418 | 10,374 | 58,953 | 69,128 | 49,159 |
| Total Cost of Goods Sold | 22,249 | 10,696 | 116,413 | 6,818 | 59,636 | 9,400 | 118,787 | 6,818 | 49,418 | 10,638 | 58,953 | 69,128 | 49,159 |
| Gross Profit | 17,752 | 39,305 | (12,536) | 23,333 | (19,486) | 40,751 | (2,482) | 13,333 | (19,268) | 29,512 | 1,247 | (7,034) | (10,923) |
| **Expenses** | | | | | | | | | | | | | |
| **Administrative Expense** | | | | | | | | | | | | | |
| Legal Fees | - | - | 56,798 | - | - | - | 56,798 | - | - | - | 56,798 | - | - |
| Total Administrative Expense | - | - | 56,798 | - | - | - | 56,798 | - | - | - | 56,798 | - | - |
| **Expense** | | | | | | | | | | | | | |
| Bank Service Charges | - | - | 202 | - | - | - | 202 | - | - | - | - | 202 | - |
| Wire Fees | | | | | | | | | | | | | |
| Software Subscriptions & Licenses | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 |
| Trade Organizations | | | | | | | | | | | | | |
| Office Supplies | - | - | 50 | - | - | - | 50 | - | - | - | - | 50 | - |
| Postage and Delivery | - | - | 25 | - | - | - | 25 | - | - | - | - | 25 | - |
| Telephone | - | - | 267 | - | - | - | 267 | - | - | - | - | 267 | - |
| Internet (Wi-Fi or Wired) | - | - | 163 | - | - | - | 163 | - | - | - | - | 163 | - |
| Miscellaneous | | | | | | | | | | | | | |

MEDIA LODGE INC.
Proposed Budget
Cash Basis

| | | | | | | | Week of | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15-Nov | 22-Nov | 29-Nov | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 1/3/2021 | 1/10/2021 | 1/17/2021 | 1/24/2021 | 1/31/2021 | 2/7/2021 |
| ORDINARY INCOME / EXPENSE | | | | | | | | | | | | | |
| Office Equipment | | | | | | | | | | | | | |
| Ad Misc. | | | | | | | | | | | | | |
| Ad Production | - | - | 402 | - | - | - | 402 | - | - | - | - | 402 | - |
| Press Releases | | | | | | | | | | | | | |
| Technology | | | | | | | | | | | | | |
| Rent | - | - | 1,599 | - | - | - | 1,599 | - | - | - | - | 1,599 | - |
| Utilities | - | - | 50 | - | - | - | 50 | - | - | - | - | 50 | - |
| Operating Expenses for Buildings (part of Rent) | - | | | | | | | | | | | | |
| Other Taxes | | | | | | | | | | | | | |
| NRA | | | | | | | | | | | | | |
| SHOT Show | | | | | | | | | | | | | |
| Ground Transportation | | | | | | | | | | | | | |
| Meals | | | | | | | | | | | | | |
| Depreciation - Website Design | | | | | | | | | | | | | |
| Depreciation - Adv Ret Seg | | | | | | | | | | | | | |
| Amortization of GunUp | | | | | | | | | | | | | |
| Wages | | | 39,774 | | 39,774 | | 39,774 | | 39,774 | | 39,774 | | |
| Contract Labor | | | 1,592 | | 1,592 | | 1,592 | | 1,592 | | 1,592 | | |
| Bonuses, Other Wages | | | 1,042 | | 1,042 | | 1,042 | | 1,042 | | 1,042 | | |
| Benefits | | | 675 | | 675 | | 675 | | 675 | | 675 | | |
| Employee Profit Sharing | | | 1,557 | | 1,557 | | 1,557 | | 1,557 | | 1,557 | | |
| Federal Unemployment tax | | | 18 | | 18 | | 18 | | 18 | | 18 | | |
| State Unemployment tax | | | 1,277 | | 1,277 | | 1,277 | | 1,277 | | 1,277 | | |
| Medicare tax | | | 777 | | 777 | | 777 | | 777 | | 777 | | |
| Workers Comp | | | 229 | | 229 | | 229 | | 229 | | 229 | | |
| Social Security tax | | | 3,321 | | 3,321 | | 3,321 | | 3,321 | | 3,321 | | |
| Administration Fee | | | 338 | | 338 | | 338 | | 338 | | 338 | | |
| Suspense Accounts | | | | | | | | | | | | | |
| Total Expense | 736 | 736 | 54,091 | 736 | 51,334 | 736 | 54,091 | 736 | 51,334 | 736 | 51,334 | 3,494 | 736 |
| Other (Income) Expense | | | | | | | | | | | | | |
| Other Expense | | | | | | | | | | | | | |
| Total Other (Income) Expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Cash Excess/(Deficit) | 17,016 | 38,569 | (123,426) | 22,597 | (70,820) | 40,015 | (113,371) | 12,597 | (70,601) | 28,776 | (106,884) | (10,527) | (11,658) |

(347,717)

**<u>Exhibit B</u>**
**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MEDIA LODGE, INC., | ) | Case No. 20-12969 (JTD) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§105, 361, 362, 363(C), 364(C)(1), 364(C)(2), 364(D)(1), 364(E) AND 507 (I) AUTHORIZING DEBTOR TO (A) OBTAIN POSTPETITION SECURED FINANCING FROM GEMINI DIRECT INVESTMENT, LLC; (B) UTILIZE CASH COLLATERAL AND (C) PAY CERTAIN RELATED FEES AND CHARGES; (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER; (III) MODIFYING THE AUTOMATIC STAY; (IV) <u>SCHEDULING A FINAL HEARING AND (V) GRANTING CERTAIN RELATED RELIEF</u>**

Upon the motion (the "**Motion**") of Media Lodge, Inc., the above-captioned debtor and debtor in possession (the "**Debtor**"), pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of this interim financing order (the "**Interim DIP Order**"), and among other things:

    i.    authorizing the Debtor to obtain senior secured postpetition financing in an aggregate

maximum principal amount of $500,000, including up to $150,000 on an interim basis

(the "**DIP Financing**"), on a superpriority basis pursuant to the terms and conditions

of that certain term sheet substantially the form attached hereto as <u>Exhibit 1</u> (the "**DIP**

**Term Sheet**"; together with any additional agreements, documents, instruments and

certificates executed, and any orders entered in connection therewith, or otherwise delivered in connection therewith by the Debtor, collectively, the "**DIP Documents**"), as borrower, and Gemini Direct Investment, LLC ("**GDI**") as lender (the **"DIP Lender**");

ii.    authorizing the Debtor to execute and deliver the DIP Term Sheet and other DIP Documents and to perform such other and further acts as may be necessary or desirable in connection with the DIP Documents;

iii.    ordering that, subject to the Carve-Out, in all respects, all obligations of the Debtor to the DIP Lender under the DIP Documents shall be:

    A.    entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code; and

    B.    secured, pursuant to section 364(c)(2) and 364(d)(1) of the Bankruptcy Code, by a first priority lien on all of the pre- and post-petition property of the Debtor whether existing on the Petition Date or thereafter acquired;

iv.    authorizing the Debtor's use of cash collateral, as defined in section 363(a) of the Bankruptcy Code, pursuant to the terms and conditions set forth in the Interim DIP Order and the DIP Term Sheet;

v.    granting adequate protection to GDI as pre-petition lender (the "**Prepetition Lender**");

vi.    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders, as applicable;

vii.    subject to and effective only upon the entry of a Final DIP Order granting such relief, (a) waiving any right of the Debtor to surcharge against the DIP Collateral or Prepetition Collateral (each as defined below), including pursuant to section 506(c) of

the Bankruptcy Code or otherwise, (b) providing that the DIP Lender and the Prepetition Lender are not subject to the equitable doctrine of "marshaling," or any other similar doctrine with respect to the DIP Collateral;

viii. scheduling by the Court of an interim hearing (the "**Interim Hearing**") to consider entry of this Interim DIP Order;

ix. scheduling by the Court of a final hearing (the "**Final Hearing**") to consider entry of an order (in form and substance acceptable to the DIP Lender), the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion;

x. approving of the Final DIP Order; and

xi. the granting of related relief.

The Court having considered the Motion, the terms of the DIP Term Sheet and the other DIP Documents, the *First Day Declaration*, and the evidence submitted at the hearing held before this Court on November [_], 2020 to consider entry of this Interim DIP Order (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rules 2002-1, 4001-2, and 9013-1, due and proper notice of the Motion and the Interim Hearing having been given under the circumstances; and it appearing that no other or further notice need be provided; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their creditors, their estates, and all other parties in interest; and essential for the continued operation of the Debtors' businesses; and

all objections, if any, to the entry of this Interim DIP Order having been withdrawn, resolved or overruled by the Court; and upon all of the proceedings had before this Court; after due deliberation and consideration, and for good and sufficient cause appearing therefor:

IT IS HEREBY FOUND:

A.    Unless otherwise indicated herein, all capitalized terms used but not defined herein shall have the meanings given in the Motion.

B.    On November [ ], 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief with this Court under Chapter 11, Subchapter V of the Bankruptcy Code commencing a Chapter 11 case in the United States Bankruptcy Court for the District of Delaware (the "Court"), Case No. 20-[_____] (the "**Chapter 11 Case**").

C.    The Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

D.    No official committee of unsecured creditors ("**Committee**"), as provided for under section 1102 of the Bankruptcy Code, has been appointed in this Chapter 11 Case.

E.    The Debtor has represented that notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtor, by telecopy, email, overnight courier and/or hand delivery, to: (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the holders of the twenty largest unsecured claims against the Debtor; (c) the Prepetition Lender; (d) counsel to GDI; (e) all other parties asserting a lien on or a security interest in the assets of the Debtor to the extent reasonably known to the Debtor; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; [(h) the office of the attorneys general for the states in which the Debtor operates]; (i) the Securities and Exchange Commission as necessary; and (j) any other party entitled to notice pursuant to

4

Bankruptcy Rule 2002 and Local Rule 2002-1 (collectively, the "**Notice Parties**"). Under the circumstances and given the nature of the relief sought in the Motion, such notice of the Interim Hearing and the relief requested in the Motion  constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c) and Local Rules 2002-1 and 4001-2.  The Court concludes that no further notice is necessary and that the form, scope and timing of notice of the Motion were adequate and sufficient under the circumstances.

F.      This Court has jurisdiction over this Chapter 11 Case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue for this Chapter 11 Case and this Motion is proper under 28 U.S.C. §§ 1408 and 1409.

G.      The Debtor requires access to postpetition financing in an amount necessary to fund (i) the Debtor's operations, (ii) the administrative costs of the Chapter 11 Case, and (iii) the pursuit of confirmation of a of reorganization.

H.      In light of the Debtor's circumstances, the Debtor is unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of its estate under section 364(c)(2) of the Bankruptcy Code or (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Financing. The only viable source of secured credit available to the Debtor, other than the use of Cash Collateral (as defined below), is the DIP Financing. The Debtor requires both additional financing under the DIP Financing and the

continued use of Cash Collateral under the terms of this Interim DIP Order to satisfy its postpetition liquidity needs.

I.       The Debtor has requested immediate entry of this Interim DIP Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2). Good and sufficient cause has been shown for entry of this Interim DIP Order. An immediate need exists for the Debtor to obtain funds and liquidity in order to continue operations, to satisfy in full the costs and expenses of administering the Chapter 11 Cases, to preserve the value of its business and estate. The ability of the Debtor to finance its operations, to preserve and maintain the value of the Debtor's assets, and to maximize the return for all creditors, requires the immediate availability of the DIP Financing and the use of the Cash Collateral. In the absence of the immediate availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtor's business would not be possible and serious and irreparable harm to the Debtor and its estate and creditors would occur. Thus, the ability of the Debtor to preserve and maintain the value of its assets and maximize the return for creditors requires the availability of working capital from the DIP Financing and the use of Cash Collateral. Accordingly, sufficient cause exists for the entry of this Interim DIP Order.

J.       Debtor's Stipulations. Subject to the limitations contained in Paragraph 15 below, the Debtor admits, stipulates and agrees as follows, for itself and its estate:

(i)      Prepetition Lender Obligations. As of the Petition Date, the Debtor was truly and justly indebted, without defense, counterclaim or offset of any kind, to the Prepetition Lender in the aggregate principal amount of approximately $9,382,132, of which $2,000,000 is secured by that to certain  Secured Promissory Note dated March 31, 2015 (the "**Note**"),between the Debtor and IA Tech, LLC as since assigned to the Prepetition Lender. The obligations thereunder, including any

premiums, expenses, indemnity, and reimbursement obligations accrued thereunder and all other fees and expenses (including fees and expenses of attorneys and advisors) as provided in the Prepetition Loan Documents (collectively, the "**Prepetition Lender Obligations**").

(ii)    <u>Prepetition Lender Obligations</u>. The Prepetition Lender Obligations in the full amount outstanding on the Petition Date constitute the legal, valid, binding and non-avoidable obligations of the Debtor to the Prepetition Lender.

(iii)    <u>Prepetition Liens</u>. The liens and security interests granted by the Debtor to the Prepetition Lender (the "**Prepetition Liens**") are: (a) valid, binding, perfected, enforceable liens on and security interests in the personal property of the Debtor constituting "Collateral" under, and as defined in, any prepetition security agreement, control agreement, pledge agreement, financing statement, mortgage or other similar documents, including the Prepetition Loan Documents (together, the "**Prepetition Lender Collateral**"); and (b) not subject to objection, defense, contest, avoidance, reduction, or disallowance (whether equitable, contractual or otherwise) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law by any person or entity. The Prepetition Liens securing the Prepetition Lender Obligations are subject and subordinate only to: (x) after giving effect to this Interim DIP Order, the Carve-Out and the DIP Liens; and (y) other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) which are permitted under the Prepetition Loan Documents and to the extent such permitted liens are senior to the Prepetition Liens.

(iv)     Cash Collateral. All proceeds of the Prepetition Lender Collateral (including cash on deposit at depository institutions as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Lender Collateral) are "cash collateral" of the Prepetition Lender within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"), and subject to the terms of this Interim DIP Order (including subject to the DIP Liens).

K.       The DIP Lender will commit to providing DIP Financing in an amount necessary to fund both the Debtor's operations and the administrative costs of the Chapter 11 Case subject to and as set forth in an agreed-upon budget submitted by the Debtor and reasonably acceptable to the DIP Lender, in an amount not exceeding $500,000 (the "**Stated Principal Amount**"), upon the terms and conditions set forth herein. Accordingly, after considering all of its practical alternatives, the Debtor has concluded, in an exercise of its sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of this Interim DIP Order and the DIP Documents represents the best financing currently available to the Debtor.

L.       The consent of the Prepetition Lender to the priming of the Prepetition Liens by the DIP Liens and use of the Prepetition Lender Collateral, including Cash Collateral, by the Debtor is limited to this Interim DIP Order and the DIP Financing presently before the Court, and shall not extend to any other postpetition financing or to any modified version of this DIP Financing with any party other than GDI as DIP Lender.  The Prepetition Lender agrees that the Adequate Protection granted to the Prepetition Lender in this Interim DIP Order is reasonable and calculated to protect the interests of the Prepetition Lender.

M.     The security interests and liens granted to the DIP Lender pursuant to this Interim

DIP Order are appropriate under sections 364(c)(1), 364(c)(2) and 364(d) of the Bankruptcy Code

because, among other things: (i) such security interests and liens do not impair the interests of any

holder of a valid, perfected, prepetition security interest or lien in the property of the Debtor's

estate, or (ii) the holders of such valid, perfected, prepetition security interests and liens, including,

for the avoidance of doubt, the Prepetition Lender has consented to the security interests and

priming liens granted pursuant to this Interim DIP Order to the DIP Lender.

N.     The Prepetition Lender is entitled to receive Adequate Protection as set forth below

pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code for any diminution in the value

of its interests in the Prepetition Collateral, including Cash Collateral, resulting from the priming

of their liens by the DIP Liens, the automatic stay and the Debtor's use, sale or lease of the

Prepetition Collateral, including Cash Collateral, during the Chapter 11 Case.

O.     Based on the record presented to this Court by the Debtor, the DIP Financing and

use of Cash Collateral have been negotiated in good faith and at arm's length between the Debtor

and the Prepetition Lender and the DIP Lender and any credit extended and loans made to the

Debtor by the DIP Lender pursuant to the Interim DIP Order, and the DIP Documents (the "**DIP**

**Obligations**") shall be deemed to have been extended, issued or made, as the case may be, in good

faith within the meaning of, section 364(e) of the Bankruptcy Code and the DIP Lender and

Prepetition Lender shall have all of the protections thereunder.

P.     Based on the record before this Court, it appears that the terms of this Interim DIP

Order, including, without limitation, the terms of the DIP Financing are fair and reasonable under

the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its

fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

Q.      The Debtor has requested entry of this Interim DIP Order. The permission granted herein to use Cash Collateral and obtain funds under the DIP Financing is necessary to avoid immediate and irreparable harm to the estate. This Court concludes that entry of this Interim DIP Order is in the best interests of the Debtor and its estate as its implementation will, among other things, enhance the prospects for a successful completion of the Chapter 11 Case.

R.      Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, DETERMINED AND DECREED THAT:**[1]

1.      <u>Motion Granted</u>. The Motion is granted on the terms and conditions set forth in this Interim DIP Order, with the foregoing findings incorporated herein by reference. Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled. This Interim DIP Order shall be valid and binding on all parties-in-interest and fully effective immediately upon entry.

2.      <u>Authorizations</u>. The Debtor is hereby authorized to execute and enter into the DIP Documents. The DIP Term Sheet, the other DIP Documents and this Interim DIP Order shall govern the financial and credit accommodations to be provided to the Debtor by the DIP Lender as described herein; *provided* that in the event of a conflict between the DIP Documents and the Interim DIP Order, the Interim DIP Order shall control. The Debtor is hereby authorized to borrow money pursuant to the DIP Term Sheet up to the Stated Principal Amount.

3.      The DIP Financing may be used in accordance with the terms of this Interim DIP Order and the DIP Term Sheet (and subject to the Budget (defined below)) to fund the day-to-day working capital needs of the Debtor's operations and the chapter 11 administrative expenses

---

[1] Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.

incurred during the pendency of the Chapter 11 Case and to allow the Debtor, if subsequently approved by the Court, to confirm a chapter 11 plan.

4.       In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), that may be reasonably required to ensure the performance of the Debtor's obligations under the DIP Financing, including, without limitation:

(i)     the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Term Sheet, any security and pledge agreements, and any mortgages contemplated thereby;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtor and the DIP Lender may agree; *provided,* that written notice of any material modification or amendment to the DIP Documents shall be filed on the docket of the Chapter 11 Case and shall be served upon (i) the Debtor's twenty (20) largest unsecured creditors, (ii) the U.S. Trustee, (iii) counsel to the Debtor, (iv) counsel to the DIP Lender, and (v) counsel to the Prepetition Lender (collectively, the "**Notice Parties**") each of whom shall have ten (10) days from the date of service of such notice within which to object in writing to such modification or amendment. If any Notice Party (or any other party in interest with requisite standing) timely objects to any such material modification or amendment to the DIP Credit Agreement, such modification or amendment shall only be effective pursuant to an order of this Court; and

(iii)   the performance of all other acts required under or in connection with the DIP Documents.

5.       Upon execution and delivery of the DIP Term Sheet and the other DIP Documents, such DIP Documents shall constitute valid, binding and non-avoidable obligations of the Debtor enforceable against the Debtor in accordance with their respective terms and the terms of this Interim DIP Order for all purposes during the Chapter 11 Case, any subsequently converted case of the Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any such case. No

obligation, payment, transfer or grant of security under the DIP Term Sheet, the other DIP Documents or this Interim DIP Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

7.      Borrowing; Use of Cash Collateral. Subject to the budget attached as <u>Exhibit A</u> to the DIP Term Sheet (as modified from time to time with the written consent of the DIP Lender in its sole discretion, but without need for further Court order, the "**Budget**") and solely in compliance therewith and subject further to the terms and conditions of this Interim DIP Order and the DIP Documents, (a) the DIP Lender will provide the DIP Financing in accordance with the terms of the DIP Documents, and (b) the Debtor is authorized to use Cash Collateral in accordance with the terms of this Interim DIP Order.

8.      Interest, Fees, Costs and Expenses. The DIP Obligations shall bear interest at an interest rate of five percent (5%) per annum as provided in the DIP Term Sheet. After an Event of Default (as described below), the interest shall accrue at an interest rate of seven percent (7%) per annum payable monthly as provided in the DIP Term Sheet.

9.      Event of Default. Each of the following events, unless waived by the DIP Lender in writing, shall constitute an "**Event of Default**":

          (i)      the Debtor (A) fails to pay any payment (whether principal, interest, or otherwise) when such amount becomes due and payable under the DIP Term Sheet or (B) defaults in the due performance or observance of any other term, covenant, or agreement contained in the DIP Term Sheet (and, if such default is capable of being remedied, it has not been remedied within the cure period set forth in the DIP Term Sheet or, if no such cure period is provided, it has not been remedied to the reasonable satisfaction of the DIP

Lender five (5) business days following written notice to the Debtor of the occurrence of such event of default);

(ii)     any representation, warranty, or statement made by the Debtor herein or in the DIP Term Sheet or in any certificate delivered in connection with the DIP Term Sheet shall prove to be untrue in any material respect on the date on which made or deemed made;

(iii)     the security interest granted to the DIP Lender shall cease to be in full force and effect, or shall cease to create a perfected security interest in, and lien on, the DIP Collateral (as defined below) purported to be created thereby;

(iv)     the DIP Term Sheet is or becomes invalid, ineffective or unenforceable against the Debtor, in whole or in part, or the Debtor so asserts or at any time denies the liability or the DIP Obligations under the DIP Term Sheet;

(v)     the Court shall enter an order dismissing the Chapter 11 Case or converting it to a case under Chapter 7 or any other chapter of the Bankruptcy Code, or appointing a trustee or other responsible officer or an examiner with enlarged powers relating to the operation of the Debtor's business (beyond those set forth in sections 1106(a)(3) or (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code, in each case, without the consent of the DIP Lender in its sole discretion;

(vi)     the Court shall enter an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code authorizing an action by a lienholder (other than the DIP Lender) with respect to assets of the Debtor on which the lienholder has a lien with an aggregate value in excess of $50,000;

(vii)     the Debtor shall seek to, or shall support any other person's motion to, disallow in whole or in part the DIP Obligations or to challenge the validity, priority, or enforceability of the DIP Liens and superpriority claims hereunder;

(viii)     a debtor-in-possession financing order shall be entered in form and substance that is not acceptable to the DIP Lender in its reasonable discretion or from and after the date of entry thereof, the Interim DIP Order or the Final DIP Order, as applicable, shall cease to be in full force and effect or shall have been vacated, stayed, reversed, modified or amended (or the Debtor shall take any step to accomplish any of the foregoing) without the consent of the DIP Lender in its sole discretion;

(ix)     the Debtor shall make any payments on any indebtedness that arose before the Petition Date other than as provided in the Budget or otherwise consented to by the DIP Lender in its sole discretion;

13

(x)     the Debtor shall be in breach or shall fail to comply with the terms of the DIP Order or the Plan, in any material respect;

(xi)    the Interim DIP Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lender in its sole discretion;

(xii)   one or more judgments or decrees shall be entered against the Debtor or its estate involving in the aggregate a postpetition liability (not paid or fully covered by insurance or otherwise considered permitted Indebtedness) of $50,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal;

(xiii)  the DIP Term Sheet or any other DIP Document shall cease, for any reason, to be in full force and effect or the Debtor shall so assert in writing, or the DIP Liens shall cease to be effective and perfected with respect to any material item of DIP Collateral (as defined below) described therein with the priority purported to be created by the DIP Documents;

(xiv)   the Debtor shall fail to provide all information, approvals, documents or other instruments as the DIP Lender may reasonably request, and as are customary for postpetition lenders or plan sponsors to request;

(xv)    an application or motion shall be filed by the Debtor for the approval of postpetition financing from any party other than the DIP Lender, including financing that provides for superpriority claims or priming liens on any of the DIP Lender's collateral without the written consent of the DIP Lender in its sole discretion;

(xvi)   entry of an order terminating the right of the Debtor to use the DIP Financing; or

(xvii)  the Debtor's failure to comply with the Budget.

10.     Upon the occurrence of an Event of Default and after five (5) business days' written notice by the DIP Lender to the Notice Parties (the "**Default Notice Period**"), the automatic stay shall terminate, and the DIP Lender and the Prepetition Lender shall be permitted to exercise any remedies permitted by law, including any of the following actions, unless the Court determines during the Default Notice Period that an Event of Default has not occurred:

(i)     declare all or any portion of the outstanding DIP Obligations and the Prepetition Lender Obligations due and payable, whereupon the same shall

14

become, forthwith due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Debtor;

(ii)     enforce all liens and security interests in the DIP Collateral and the Prepetition Lender Collateral;

(iii)    institute proceedings to enforce payment of such DIP Obligations and the Prepetition Lender Obligations;

(iv)    terminate the obligation of the DIP Lender to make Loans; and

(v)     exercise any other remedies and take any other actions available to it at law, in equity, under the DIP Term Sheet, the Prepetition Loan Documents, the Bankruptcy Code, other applicable law or pursuant to this Interim DIP Order;

*provided*, *however,* that the DIP Lender shall continue to fund the Debtor's operations, pursuant to the Budget, through the Default Notice Period. Notwithstanding the foregoing, absent prior written consent of the DIP Lender (in its sole discretion), the Prepetition Lender shall not exercise any rights or remedies under this paragraph until after the DIP Obligations have been Paid in Full (as defined below), and in all events, the proceeds of any exercise of rights or remedies by the Prepetition Lender shall be remitted to the DIP Lender until the DIP Obligations have been Paid in Full.

11.     <u>Termination of the DIP Financing and Use of Cash Collateral</u>. Except with respect to the payment of the Carve-Out (as defined herein), the DIP Lender's agreement to provide the DIP Financing in accordance with the DIP Documents and the Debtor's authorization to use Cash Collateral shall immediately and automatically terminate (except as the DIP Lender may otherwise agree in writing in its reasonable discretion), upon the earliest to occur of any of the following (each, a "**Termination Date**"):

(i)     May __ 2021;

(ii)    the date of final indefeasible payment and satisfaction in full in cash of the DIP Obligations;

(iii)    the entry of an order by the Court granting a motion by the Debtor to obtain additional financing from a party other than DIP Lender under section 363 or 364 of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash the DIP Obligations or unless such financing is subordinate to the DIP Obligations and Prepetition Lender Obligations and consented to in writing by the DIP Lender (which consent may be withheld in its reasonable discretion);

(iv)    the dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(v)    any DIP Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lender (which consent may be withheld in its reasonable discretion);

(vi)    the Effective Date of the Plan; or

(vii)    upon five (5) business days' written notice of any Event of Default.

12.    <u>Superpriority Claims</u>. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims against the Debtor (the "<u>Superpriority Claims</u>") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtor's estate, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and postpetition property of the Debtor and all proceeds thereof, subject only to the Carve-Out, to the extent specifically provided for herein.

13.    <u>Carve-Out</u>. The liens and claims of or granted to the DIP Lender and the Prepetition Lender shall be subject and subordinate to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "**Carve-Out**"): (a) all allowed fees and expenses of attorneys, investment bankers and financial advisors (collectively, the "**Estate Professionals**") employed by the Debtor or its estate pursuant to sections 327 and 328 of the Bankruptcy Code, subject to the Budget, that accrued prior to the Termination Date (i) solely to the extent set forth in (and limited by) the Budget.   In the event the DIP Financing is terminated and notice of the Termination Date is provided, the DIP Lender will fund the Carve-Out Amount to the Debtor as needed to pay any fees and expenses of Estate Professionals that the Debtor is authorized to pay pursuant to an interim compensation or other order entered by the Court. Notwithstanding any other provision of this Interim DIP Order (including this paragraph above), the Court retains and shall have all authority to consider and approve all applications for fees and expenses by any Estate Professionals, including for reasonableness thereof, or on any other basis under the Bankruptcy Code or Bankruptcy Rules, or otherwise under applicable law, and all funds that may be set aside for or applied to any such amounts or obligations shall remain fully subject to disgorgement or reallocation, based on the Court's orders exercising such reserved rights as described previously in this sentence. All professionals described in the preceding sentence shall be and remain subject to the jurisdiction of this Court for the purposes described in the preceding sentence.

14.    Notwithstanding the foregoing, none of the Carve-Out, proceeds from the DIP Financing or Cash Collateral may be used (a) to investigate or challenge in any respect to the validity, perfection, priority, extent or enforceability of the DIP Liens, Prepetition Liens or Adequate Protection Liens (as defined below), (b) to delay, challenge or impede any rights of the

DIP Lender under any of the DIP Documents, or the DIP Orders or the Prepetition Lender under the Prepetition Loan Documents, or (c) to pursue any claims or causes of action of any kind against the DIP Lender or the Prepetition Lender (except for purposes of enforcement of the DIP Orders or the DIP Term Sheet). Nothing herein shall restrict the ability of any other party to investigate or object to a disclosure statement or a plan of reorganization.

15.     <u>Effect of Debtor's Stipulations on Third Parties</u>.

(i)     <u>Binding on Debtor</u>. The Debtor's stipulations, admissions, agreements and releases contained in this Interim DIP Order, including, without limitation, in Paragraph J of this Interim DIP Order, shall be binding upon the Debtor in all circumstances and for all purposes.

(ii)    <u>Binding on Third Parties</u>. The Debtor's stipulations, admissions, agreements and releases contained in this Interim DIP Order, including, without limitation, in Paragraph J of this Interim DIP Order, shall be binding upon its estate and all other parties-in-interest, including, without limitation, any other person or entity acting or seeking to act on behalf of the Debtor's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor, in all circumstances and for all purposes unless the following criteria under subparagraphs 15(ii)(a), (b), and (c) below are satisfied:

a.     <u>Challenge Period</u>. Any party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so, a "**Challenge Party**") with requisite standing granted by the Court (which motion for such standing may be filed concurrently with an adversary proceeding or contested matter), has timely filed an adversary proceeding or

contested matter (subject to the limitations contained herein, by no later than (x) a date that is 45 days after entry of this Interim DIP Order for all parties in interest; and (y) any such later date that has been ordered by the Court for good cause shown upon a motion filed and served within any applicable period of time set forth in this Paragraph 15(c) (the "**Challenge Period**"); *provided, however*, that if the Chapter 11 Case converts to a chapter 7 case, or if a chapter 11 trustee is appointed, prior to the end of the Challenge Period, any such trustee shall have the benefit of any remaining portion of the Challenge Period.

b.   <u>Challenge Proceeding</u>. Such adversary proceeding or contested matter (A) objects to or challenges the amount, validity, perfection, enforceability, priority or extent of the Prepetition Lender Obligations or the Prepetition Liens, or any portion thereof, or (B) otherwise asserts or prosecutes any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, a "**Challenge Proceeding**") against the Prepetition Lender, or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Loan Documents, the Prepetition Lender Obligations, the Prepetition Liens or the Prepetition Lender Collateral.

    c.  <u>Final Non-Appealable Order</u>. A final non-appealable order is entered in favor of the plaintiff in any such Challenge Proceeding; provided that any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred.

(iii)  <u>Agreement to Not Assert a Challenge</u>. Notwithstanding the foregoing, the DIP Lender hereby agrees not to (and hereby waives any right to) take any action to contest or challenge (or assist or support any other person in contesting or challenging), directly or indirectly, the extent, validity, priority, enforceability or perfection of the Prepetition Lender Obligations or the Prepetition Liens.

(iv)  <u>Failure to File Challenge Proceeding</u>. If no Challenge Proceeding is timely and properly filed during the Challenge Period with respect to the Prepetition Lender Obligations or Prepetition Liens: (i) the Debtor's stipulations, admissions, agreements and releases contained in this Interim DIP Order relating thereto, including, without limitation, those contained in Paragraph J of this Interim DIP Order shall be binding on all parties in interest; (ii) the obligations of the Prepetition Lender under the Prepetition Loan Documents shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance for all purposes in this Chapter 11 Case and any subsequent chapter 7 case; (iii) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; (iv) the Prepetition

Lender Obligations and the Prepetition Liens shall not be subject to any other or further claim or challenge by any non-statutory committees appointed or formed in this Chapter 11 Case or any other party-in-interest acting or seeking to act on behalf of the Debtor's estate; and (v) any defenses, claims, causes of action, counterclaims and offsets by any non-statutory committees appointed or formed in this Chapter 11 Case, or any other party acting or seeking to act on behalf of the Debtor's estate, whether arising under the Bankruptcy Code or otherwise, against the Prepetition Lender arising out of or relating to the Prepetition Loan Documents shall be deemed forever waived, released and barred. If any such Challenge Proceeding is timely filed during the Challenge Period, the applicable stipulations, admissions, agreements and releases contained in this Interim DIP Order, including, without limitation, those contained in Paragraph J of this Interim DIP Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim DIP Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee or any non-statutory committees appointed or formed in the Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estate, including, without limitation, Challenge Proceedings with respect to the Prepetition Loan Documents, the Prepetition Lender Obligations or the Prepetition Liens. Any motion seeking standing shall attach a draft complaint

21

or other pleading that sets forth such claim or cause of action or other Challenge Proceedings, and any claim or cause of action or other Challenge Proceeding not included therein shall be deemed forever waived, released and barred.

16.     Subject to the terms of this Interim DIP Order and any interim compensation order entered by the Court, the DIP Lender shall be obligated to fund and the Debtor shall be permitted to pay compensation and reimbursement of reasonable fees and expenses of the Estate Professionals allowed and payable under sections 328, 330 or 331 of the Bankruptcy Code, as the same may be due and payable, that constitute pre-Termination Date expenses and such payments shall not reduce or be deemed to reduce the post-Termination Date fees and expenses.

17.     <u>Liens to Secure the DIP Obligations</u>. As security for the DIP Obligations, effective and perfected upon the date of this Interim DIP Order and without the necessity of the execution, recordation of filings by the Debtor or the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of or over any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtor to the DIP Lender for its benefit (all property identified in clauses (a) and (b) below being collectively referred to as the "**DIP Collateral**"), subject only to the payment of the Carve-Out (all such liens and security interests granted to the DIP Lender for its benefit pursuant to this Interim DIP Order and the DIP Documents, the "**DIP Liens**"):

(a)     *First Lien on All Property.* Pursuant to sections 364(c)(1), 364(c)(2) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all pre- and postpetition property of the Debtor or its estate, whether existing on the Petition Date or thereafter acquired (collectively, "<u>Property</u>"), including,

without limitation, any such encumbered cash of the Debtor and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, the proceeds of the claims and causes of action of the Debtor's estate under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code, commercial tort claims, equity interests, and the proceeds of all the foregoing; *provided, however*, that the DIP Liens shall be subject and subordinate to any inchoate governmental claims or statutory liens in existence as of the Petition Date.

(b)    *Liens Senior to Certain Other Liens.* The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor to the extent permitted by applicable non-bankruptcy law, or (iii) any intercompany or affiliate liens of the Debtor.

18.    <u>Perfection of DIP Liens</u>. The DIP Liens shall be, and hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; *provided, however*, that notwithstanding the provisions of section 362 of the Bankruptcy Code, (a) the DIP Lender, may, at its sole option, file or record or cause the Debtor to obtain any such

landlord or warehousemen lien waivers or other third party consents or execute, file or record, any such UCC financing statements, notices of liens and security interests, mortgages, amendments to mortgages and/or other similar documents or instruments as the DIP Lender may require, and (b) the DIP Lender may require the Debtor to deliver to the DIP Lender, any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the Debtor shall cooperate and comply therewith. If the DIP Lender, in its reasonable discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages, amendments to mortgages or other documents or instruments with respect to such security interests and liens, or if the DIP Lender, in accordance with the DIP Documents or this Interim DIP Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements, mortgages, amendments to mortgages or similar documents or instruments or such taking of possession shall be deemed to have been filed, recorded or taken in the Chapter 11 Case as of the commencement of the Chapter 11 Case but with the priorities set forth herein. The DIP Lender may (in its reasonable discretion), but shall not be required to, file a certified copy of this Interim DIP Order in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property and such filing or recording shall constitute further evidence of the DIP Lender's interest in the DIP Collateral.

19.     <u>Indemnity</u>. The Debtor agrees to indemnify, defend, and hold harmless the DIP Lender, each of its affiliates, and each of their respective officers, directors, employees, agents, advisors, attorneys, and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, fees and expenses of counsels) for any actions,

omissions, or events arising from or directly related to the DIP Financing, except to the extent resulting from the DIP Lender's gross negligence or willful misconduct.

20. <u>Preservation of Rights Granted Under this Interim DIP Order</u>. No claim or lien having a priority superior to or *pari passu* with those granted by the DIP Orders to the DIP Lender or the Prepetition Lender shall be granted or allowed until the occurrence of (a) the payment in full in cash of immediately available funds of all of the DIP Obligations and Prepetition Lender Obligations, (b) the termination or expiration of all commitments to extend credit to the Debtor under the DIP Documents, and (c) the cash collateralization in respect of any asserted claims, demands, actions, suits, proceedings, investigations, liabilities, fines, costs, penalties, or damages for which the DIP Lender or Prepetition Lender may be entitled to indemnification by the Debtor ("**Paid in Full**"). While any portion of the DIP Financing (or any refinancing thereof), the DIP Obligations or the Prepetition Lender Obligations remain outstanding and the commitments thereunder have not been terminated, the DIP Liens and the Prepetition Liens shall not be (x) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (y) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise except as provided in this Interim DIP Order.

21. If an order dismissing the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise is entered at any time prior to the DIP Obligations being Paid in Full, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, DIP Liens granted to the DIP Lender and the Adequate Protection Obligations granted to the Prepetition Lender shall continue in full force and effect and shall maintain their priorities as provided in the DIP Orders until all DIP Obligations and Prepetition

Lender Obligations shall have been indefeasibly Paid in Full (and that such Superpriority Claims, DIP Liens and Adequate Protection Obligations, shall, notwithstanding such dismissal, remain binding on all parties-in-interest) and (ii) to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

22.     If any or all of the provisions of this Interim DIP Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of the Superpriority Claims, DIP Liens and Adequate Protection Obligations granted hereby with respect to any DIP Obligations or Prepetition Lender Obligations. To the extent permitted by applicable law, notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral or DIP Obligations incurred by the Debtor or its estate prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of the DIP Orders, and the DIP Lender and the Prepetition Lender shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim DIP Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral and the DIP Obligations; *provided, however*, that absent the prior written consent of the DIP Lender (in its sole discretion), the  Prepetition Lender shall not exercise any rights or remedies under this paragraph until after the DIP Obligations have been Paid in Full, and in all events, the proceeds of any exercise of rights or remedies by the Prepetition Lender shall be remitted to the DIP Lender until the DIP Obligations have been Paid in Full.

23.     Except as expressly provided in the DIP Orders or in the DIP Documents, or until the DIP Obligations are Paid in Full, the DIP Liens, the Superpriority Claims, the Adequate Protection Obligations (defined in Paragraph 27(e) below) and all other rights and remedies of the DIP Lender and Prepetition Lender granted by the provisions of the DIP Orders and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (a) the entry of an order converting the Chapter 11 Case to a case under chapter 7, or dismissing the Chapter 11 Case or (b) the entry of an order confirming a plan of reorganization in the Chapter 11 Case (other than a plan of reorganization which is consistent with the terms of the Plan) and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor waives any discharge as to any remaining DIP Obligations and Adequate Protection Obligations. The terms and provisions of the DIP Orders and the DIP Documents shall continue in the Chapter 11 Case, or in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims, the Adequate Protection Obligations and all other rights and remedies of the DIP Lender and Prepetition Lender granted by the provisions of this Interim DIP Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and Prepetition Lender Obligations are Paid in Full; *provided, however*, that absent the prior written consent of the DIP Lender (in its sole discretion), the Prepetition Lender shall not exercise any rights or remedies under this paragraph until after the DIP Obligations have been Paid in Full, and in all events, the proceeds of any exercise of rights or remedies by the Prepetition Lender shall be remitted to the DIP Lender until the DIP Obligations have been Paid in Full.

24.     <u>Treatment of DIP Obligations and Adequate Protection Obligations in the Plan</u>. Notwithstanding anything to the contrary in the DIP Orders or in the DIP Documents, any plan of reorganization proposed by the Debtor shall provide for the treatment of the DIP Obligations, the

DIP Liens, the Superpriority Claim and the Adequate Protection Obligations on terms that are consistent with the terms of the Plan.

25.     <u>Right to Credit Bid</u>. Subject to section 363(k) of the Bankruptcy Code and entry of this Interim DIP Order, (a) the DIP Lender and (b) subject to the indefeasible payment in full in cash of the DIP Obligations, or the consent of the DIP Lender, the Prepetition Lender shall have the right to "credit bid" the full amount of its claims in connection with any sale of all or any portion of the Debtor's assets, including, without limitation, a sale transaction under section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

26.     <u>Adequate Protection of the Prepetition Lender</u>. The consent of the Prepetition Lender to the priming of the Prepetition Liens by the DIP Liens is limited to the DIP Financing presently before this Court and authorized by this Interim DIP Order (as amended supplemented or otherwise modified in accordance with the terms thereof and hereof), and shall not be deemed to, extend to any other postpetition financing with any other party (other than any permitted successors and assigns of the DIP Lender) or any increase in the total amount of the DIP Loan approved by this Interim DIP Order. Furthermore, the consent of the Prepetition Lender to the priming of the Prepetition Liens by the DIP Liens as provided in this Interim DIP Order does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Lender that its interests in the Prepetition Lender Collateral is adequately protected pursuant to this Interim DIP Order or otherwise. Nothing in this Interim DIP Order, including any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Prepetition Lender is or will be adequately protected

with respect to any non-consensual use of Cash Collateral or non-consensual priming of the Prepetition Liens.

(a)     <u>Adequate Protection Obligations</u>. Until the indefeasible repayment in full in cash of the Prepetition Lender Obligations, as adequate protection for the interests of the Prepetition Lender in the Prepetition Lender Collateral, the Prepetition Lender is hereby granted the following (collectively, "**Adequate Protection**"):

(b)     <u>Adequate Protection Liens</u>. Pursuant to sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Prepetition Lender is hereby granted a continuing valid, binding, enforceable and perfected, lien and security interest in and on all of the DIP Collateral and any proceeds thereof (the "**Adequate Protection Liens**"). The Adequate Protection Liens shall be subordinate only to (1) the Carve-Out, and (2) the DIP Liens. The Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment or avoidance, for all purposes in the Chapter 11 Case and any successor case. Except as described above, no other liens or security interests, whether for adequate protection or otherwise, shall be senior, equal to or *pari passu* with the Adequate Protection Liens in the Chapter 11 Case or any successor case without the prior written consent of the Prepetition Lender (which consent may be withheld in their sole discretion).

(c)     <u>Adequate Protection Claims</u>. Pursuant to section 507(b) of the Bankruptcy Code, the Prepetition Lender shall have an allowed superpriority administrative expense claim (the "**Adequate Protection Claim**") against the Debtor and its estate. The Adequate Protection Claim shall be subordinate only to (1) the Carve-Out, (2) the

DIP Liens, and (3) the Superpriority Claims. Except as described above, no cost or expense of administration under any provision of the Bankruptcy Code (whether incurred in this Chapter 11 Case or any successor case, whether for adequate protection, the lack of, or failure to provide, adequate protection, or otherwise), shall be senior to, equal to, or *pari passu* with, the Adequate Protection Claims.

(d)     <u>Adequate Protection Obligations</u>. The Adequate Protection Liens and Adequate Protection Claims shall secure the payment of the Prepetition Lender Obligations in an amount equal to any diminution in the value of the interests of the Prepetition Lender in the Prepetition Lender Collateral from and after the Petition Date (the amount of such diminution, the "**Adequate Protection Obligations**") including any such diminution resulting from the following: (i) the use by the Debtor of the Prepetition Lender Collateral; (ii) the imposition of the DIP Liens priming the Prepetition Liens; (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code; or (iv) the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Lender Collateral or otherwise. The Adequate Protection Obligations shall also be deemed to include the other obligations arising on account of the Adequate Protection set forth herein.

(e)     <u>Reservation of Rights of Prepetition Lender</u>. Notwithstanding any other provision hereof, the relief granted hereby is without prejudice to the right of the Prepetition Lender to seek additional adequate protection of its interests. The Prepetition Lender acknowledges that the DIP Liens securing the DIP Loan are senior to the Prepetition Liens securing the Prepetition Lender Obligations, and the

Superpriority Claims are senior to the Prepetition Lender Obligations. Except as expressly provided herein, nothing contained in this Interim DIP Order shall impair or modify any rights, claims or defenses available in law or equity to the Prepetition Lender. The consent of the Prepetition Lender to the priming of the Prepetition Liens by the DIP Liens and the Carve-Out is limited to the DIP Loan and the Carve-Out and does not constitute, and shall not be construed as constituting, an acknowledgement or stipulation by the Prepetition Lender that, absent such consent, its interests in the Prepetition Lender Collateral would be adequately protected pursuant to this Interim DIP Order.

27. Subject to the entry of the Final DIP Order, as a further condition of the DIP Financing, any obligation of the DIP Lender to make the DIP Loan, and the Debtor's authorization to use the Cash Collateral, the Debtor (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Case or any Successor Case) shall be deemed to have waived any rights, benefits or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Lender, the DIP Liens, the DIP Collateral, the Prepetition Lender, the Adequate Protection Liens, the Prepetition Liens or the Prepetition Lender Collateral. Except for the Carve-Out, nothing contained in this Interim DIP Order, in the Final DIP Order or in the other DIP Loan Documents shall be deemed a consent by the Prepetition Lender or the DIP Lender to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral or the Prepetition Lender Collateral under section 506(c) of the Bankruptcy Code or otherwise.

28. <u>Effect of Stipulations on Third Parties</u>. Each stipulation, admission and agreement contained in the DIP Orders, shall be binding upon the Debtor and any successor thereto

(including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for the Debtor) under all circumstances and for all purposes, and the Debtor is deemed to have irrevocably waived and relinquished all claims against the DIP Lender as of the date of entry of the applicable DIP Order. Subject to the Challenge Period, each stipulation, admission and agreement contained in the DIP Orders shall also be binding upon all other parties in interest under all circumstances and for all purposes.

29.     Insurance and Taxes. The Debtor shall maintain insurance on all insurable property now or hereafter owned against such risks and to the extent customary in its industry. The Debtor shall further maintain or cause to be maintained general liability and worker's compensation insurance in amounts customary in its industry. The Debtor shall provide to the DIP Lender the number(s) of any and all insurance policies in effect, the names, addresses, and contact persons of any entities issuing such insurance and a summary of the terms and payment arrangement for any such insurance policies. The DIP Lender shall be named the loss payee on such insurance policies.

30.     Financial Reporting. The Debtor shall provide any reporting provided for under the DIP Term Sheet and the Prepetition Loan Documents to the DIP Lender.

31.     Covenants. Unless otherwise modified pursuant to this Interim DIP Order, the Debtor acknowledges and agrees that it shall cause the timely compliance with all of the covenants set forth in this Interim DIP Order and the DIP Documents.

32.     No Modification of DIP Orders. The Debtor shall not, without the DIP Lender's prior written consent (which shall be given or refused in the DIP Lender's sole discretion) seek to modify, vacate or amend the DIP Orders or any DIP Documents.

33.     <u>Prepetition Lender's Rights</u>. Notwithstanding anything to the contrary contained in the DIP Orders, the Prepetition Lender shall have consultation rights, but not consent rights, with respect to the DIP Documents.

34.     <u>Binding Effect on Successors and Assigns</u>. The DIP Documents and the provisions of the DIP Orders, including all findings herein, shall be binding upon all parties-in-interest in the Chapter 11 Case, including, without limitation, the Debtor, the Prepetition Lender, the DIP Lender and each of their respective successors and assigns, including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the Debtor's estate, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor) and shall inure to the benefit of the Prepetition Lender, the DIP Lender, the Debtor, and each of their respective successors and assigns, *provided, however,* that the DIP Lender and the Prepetition Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or similar responsible person appointed for the estate of the Debtor. In determining to make any loan (whether under the DIP Promissory Note or otherwise) or permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to the DIP Orders or the DIP Documents, the DIP Lender shall not (i) be deemed to be in control of the operations of the Debtor, (ii) owe any fiduciary duty to the Debtor, its creditors, shareholders or estate or (iii) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

35.     <u>Effectiveness</u>. This Interim DIP Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, the Interim DIP Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim DIP Order.

36.     <u>Waiver of any Applicable Stay</u>. Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim DIP Order.

37.     <u>Timeliness</u>. Time is of the essence with respect to all performance required by this Interim DIP Order.

38.     <u>Objections Overruled or Withdrawn</u>. All objections to the entry of the Interim DIP Order have been withdrawn or are hereby overruled.

39.     <u>Controlling Effect of Interim DIP Order</u>. To the extent any provisions in this Interim DIP Order conflict with any provisions of the Motion, or any DIP Document the provisions of this Interim DIP Order shall control.

40.     <u>Final Hearing</u>**.**

(a)     The Final Hearing to consider entry of the Final DIP Order and final approval of the DIP Financing is scheduled for _____, __ 2020 at ____:____ __.m (EST) at the  United States Bankruptcy Court for the District of Delaware**.**

(b)     On or before two (2) business days after entry of this Interim DIP Order, the Debtor shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim DIP Order and of the Final Hearing (the "**Final Hearing Notice**"),

together with copies of this Interim DIP Order and the Motion, on: (a) the Notice Parties; (b) to any other party that has filed a request for notices with this Court prior to such date; (c) the Internal Revenue Service; (d) the state taxing authorities in any state in which the Debtor does business; (e) any federal or state regulatory authorities governing the Debtors' industry; (f) the U.S. Attorney's Office; and (h) the U.S. Trustee. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final DIP Order shall file written objections with the Clerk of the Court no later than _____, 2020 at ____:____ __.m. (EST), which objections shall be served so that the same are received on or before such date by: (a) proposed counsel for the Debtor, Gellert Scali Busenkell & Brown, Attn: Michael Busenkell, 1201 North Orange Street, Wilmington, DE 19801, mbusenkell@gsbblaw.com; (b) counsel to Gemini Direct Investment, LLC, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, DE 19801 c/o Jeremy Ryan, Esq. (jryan@potteranderson.com, and (c) the U.S. Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: [ ].

(c)     Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce this Interim DIP Order according to its terms.

**Exhibit 1**

DIP Term Sheet

## DEBTOR-IN-POSSESSION
## FINANCING TERM SHEET

**The contents of this term sheet are for discussion purposes only, represent settlement discussions, and are subject to Federal Rule of Evidence 408. This letter is non-binding and does not summarize all potential terms or conditions that may apply to any such transactions, and this term sheet does not constitute an agreement, a commitment, a contract to provide a commitment, or an offer to enter into any contract to consummate any of the transactions described herein.**

| | |
|---|---|
| ***Borrower:*** | Media Lodge, Inc. ("***Media Lodge***" or "***Borrower***"), as a debtor and debtor-in-possession in a case (the "***Case***") pending as of the filing date (the "***Filing Date***") under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq., "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware ("***Bankruptcy Court***"). |
| ***Lenders and Agent:*** | Gemini Direct Investments, LLC (the "***Lender***"). |
| ***Financing Facility:*** | A super-priority, senior secured, debtor-in-possession credit facility with a maximum credit amount ("***Maximum Amount***") of $500,000, with $150,000 available on an interim basis (the "***Facility***"). |
| ***Availability under Facility:*** | Draws under the Facility ("***Draws***") would be available up to the Maximum Amount.<br><br>The Borrower would only be permitted to request Draws to the extent required to pay, when due, those expenses enumerated in the Budget (defined below). |
| ***Use of Proceeds:*** | To (i) finance the ongoing general corporate needs of Borrower to the extent set forth in the Budget, and (ii) pay for administrative expenses incurred during the Case and set forth in the Budget. |
| ***Fees and Interest Rates for Facility:*** | No fees.<br><br>Interest rate of five (5%) percent calculated on a 360 day year and actual days elapsed. |
| ***Term of Facility:*** | Repayment on earlier of (1) 180 days from the Filing Date, (2) a sale of all the Debtor's assets, (3) effective date of a plan (unless a plan is confirmed that requires repayment on other terms), (4) dismissal of the case, (5) conversion to chapter 7, (6) the appointment of a trustee, or (7) |

conversion from subchapter V of chapter 11 ("***Maturity Date***").

**Collateral under ABL Facility:**  Subject to the Carve-Outs (as defined below), all Obligations of the Loan Parties to Agent and Lenders shall be secured by all real and personal property of Borrower (the "***Collateral***"), including, effective upon entry of a Final Order (defined below), all causes of action and proceeds thereof under chapter 5 of the Bankruptcy Code.

All obligations of the Loan Parties in respect of the ABL Facility shall be (i) entitled to super-priority administrative expense claim status pursuant to § 364(c)(1) of the Bankruptcy Code with priority over all administrative expenses of the kind that are specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code ("***Superpriority Claims***"), subject to the Carve-Outs; and (ii) secured, pursuant to §§ 364(c)(2) and (c)(3) & § 364(d) of the Bankruptcy Code by a security interest and lien on the Collateral, subject to the Carve-Outs.

**Budget:**  As used herein, "***Budget***" means the following:  an operating budget setting forth the projected financial operations of the Borrower, which budget shall be in form and substance satisfactory to the Lender and shall in any event include available cash, cash flow, trade payables, total expenses and capital expenditures and projected Availability during the term of the Facility.  The Budget will be updated weekly during the continuance of the Case to the extent approved by Lender.

**Budget Compliance under Facility:**  Measured, on a cumulative basis, as of the last day of the first full week after the Filing Date and the last day of each week thereafter through, and including, the fourth week and, with respect to each week after the fourth week, on a trailing four-week basis, (i) post-petition disbursements may not exceed 110% of Budgeted disbursements during the applicable Budget period, (ii) post-petition receipts may not be less than 90% of Budgeted receipts during the applicable Budget period, and (iii) post-petition sales may not be less than 90% of Budgeted sales during the applicable Budget period.

**Carve-Outs:**  The liens of the Lender and the Superiority Claims shall be subject to a carve-out (the "***Carve-Out***"), which shall (i) be the lesser of the amount set forth in the Budget for the period from the Filing Date to the Carve-Out Termination Date and the amount of allowed fees and expenses that

accrue during such period, (ii) be reduced by payments made to the applicable professionals and (iii) be paid first out of any prepetition retainer. After the Carve-Out Termination Date, Lenders will provide to Borrower in an amount equal to the Carve-Out amount set forth in the immediately preceding sentence plus $10,000 (to be used for the sole purpose of funding the applicable professionals after the Carve-Out Termination Date, subject to the terms of the Orders (as defined below)).

The "***Carve-Out Termination Date***" shall mean the earliest of (x) the occurrence of a default or event of default under the Facility and notification to Borrower of such default or event of default, (y) the date on which the any existing obligations have been Paid in Full and (z) the Maturity Date.

|  |  |
|---|---|
| ***Events of Default under Facility:*** | The credit agreement governing the Facility would include usual and customary events of default for financings of this type, including, without limitation, (1) failure to repay the Loan within 180 days from the Filing Date, (2) a sale of all the Debtor's assets, (3) dismissal of the case, (4) conversion to chapter 7, (5) the appointment of a trustee, (6) obtaining financing from any entity or person other than the Lender, or (7) conversion from subchapter V of chapter 11. |
| ***Assignments under ABL Facility:*** | Lender would be permitted to assign its rights and obligations under the loan documents, or any part thereof, to any person or entity without the consent of Borrower. |
| ***Governing Law and Forum under Facility:*** | Delaware. |

# **<u>EXHIBIT A TO TERM SHEET</u>**

MEDIA LODGE INC.
Proposed Budget
Cash Basis

|  | 15-Nov | 22-Nov | 29-Nov | 6-Dec | 13-Dec | 20-Dec | Week of 27-Dec | 1/3/2021 | 1/10/2021 | 1/17/2021 | 1/24/2021 | 1/31/2021 | 2/7/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ORDINARY INCOME / EXPENSE** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Income | | | | | | | | | | | | | |
| Banner Ads - Programmatic Ads | 1 | 1 | 2 | 150 | 150 | 150 | 200 | 150 | 150 | 150 | 200 | 150 | 150 |
| Banner Exchange | 40,000 | 50,000 | 103,875 | 30,000 | 40,000 | 50,000 | 116,105 | 20,000 | 30,000 | 40,000 | 60,000 | 61,944 | 38,086 |
| Total Income | 40,001 | 50,001 | 103,877 | 30,150 | 40,150 | 50,150 | 116,305 | 20,150 | 30,150 | 40,150 | 60,200 | 62,094 | 38,236 |
| | | | | | | | | | | | | | |
| Cost of Goods Sold | | | | | | | | | | | | | |
| Hosting / Data Center | - | 255 | - | - | - | 264 | - | - | - | 264 | - | - | - |
| Production Costs | - | 255 | - | - | - | 264 | - | - | - | 264 | - | - | - |
| | | | | | | | | | | | | | |
| Commission | - | - | - | - | 39,038 | - | - | - | 27,582 | - | - | - | 27,582 |
| Advertising Consult - Programmatic | 1,651 | 1,305 | 651 | | | | | | 1,238 | 1,238 | 1,238 | 1,238 | 979 |
| Publisher Costs (Bloggers) | 13,780 | - | 41,340 | - | 13,780 | - | 41,340 | - | 13,780 | - | 41,340 | - | 13,780 |
| Banner Exchange | - | 640 | - | - | - | 640 | - | - | - | 640 | - | - | - |
| Ad Creation/Graphic Desogn (For Advertisers) | - | 478 | - | - | - | 478 | - | - | - | 478 | - | - | - |
| Advertising Joint Venture | - | 1,200 | - | - | - | 1,200 | - | - | - | 1,200 | - | - | - |
| Ad Operations | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 |
| Video Production | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | - |
| Video Production Get Zone | - | - | 4,557 | - | - | - | 4,557 | - | - | - | 4,557 | - | - |
| Billable Expenses | | | | | | | | | | | | | |
| Credit Card fees | - | - | 1,062 | - | - | - | 1,062 | - | - | - | - | 1,062 | - |
| Gateway Fees | - | - | 10 | - | - | - | 10 | - | - | - | - | 10 | - |
| Advance Retail Segmentation Expense | - | - | 56,976 | - | | | 60,000 | | | | | 60,000 | |
| | | | | | | | | | | | | | |
| Selling Costs | 22,249 | 10,441 | 116,413 | 6,818 | 59,636 | 9,136 | 118,787 | 6,818 | 49,418 | 10,374 | 58,953 | 69,128 | 49,159 |
| Total Cost of Goods Sold | 22,249 | 10,696 | 116,413 | 6,818 | 59,636 | 9,400 | 118,787 | 6,818 | 49,418 | 10,638 | 58,953 | 69,128 | 49,159 |
| Gross Profit | 17,752 | 39,305 | (12,536) | 23,333 | (19,486) | 40,751 | (2,482) | 13,333 | (19,268) | 29,512 | 1,247 | (7,034) | (10,923) |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Expenses | | | | | | | | | | | | | |
| Administrative Expense | | | | | | | | | | | | | |
| Legal Fees | - | - | 56,798 | - | - | - | 56,798 | - | - | - | 56,798 | - | - |
| Total Administrative Expense | - | - | 56,798 | - | - | - | 56,798 | - | - | - | 56,798 | - | - |
| | | | | | | | | | | | | | |
| Expense | | | | | | | | | | | | | |
| Bank Service Charges | - | - | 202 | - | - | - | 202 | - | - | - | - | 202 | - |
| Wire Fees | | | | | | | | | | | | | |
| Software Subscriptions & Licenses | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 |
| Trade Organizations | | | | | | | | | | | | | |
| Office Supplies | - | - | 50 | - | - | - | 50 | - | - | - | - | 50 | - |
| Postage and Delivery | - | - | 25 | - | - | - | 25 | - | - | - | - | 25 | - |
| Telephone | - | - | 267 | - | - | - | 267 | - | - | - | - | 267 | - |
| Internet (Wi-Fi or Wired) | - | - | 163 | - | - | - | 163 | - | - | - | - | 163 | - |
| Miscellaneous | | | | | | | | | | | | | |

MEDIA LODGE INC.
Proposed Budget
Cash Basis

|  | 15-Nov | 22-Nov | 29-Nov | 6-Dec | 13-Dec | 20-Dec | Week of 27-Dec | 1/3/2021 | 1/10/2021 | 1/17/2021 | 1/24/2021 | 1/31/2021 | 2/7/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ORDINARY INCOME / EXPENSE |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Office Equipment |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Ad Misc. |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Ad Production | - | - | 402 | - | - | - | 402 | - | - | - | - | 402 | - |
| Press Releases |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Technology |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Rent | - | - | 1,599 | - | - | - | 1,599 | - | - | - | - | 1,599 | - |
| Utilities | - | - | 50 | - | - | - | 50 | - | - | - | - | 50 | - |
| Operating Expenses for Buildings (part of Rent) | - |  |  |  |  |  |  |  |  |  |  |  |  |
| Other Taxes |  |  |  |  |  |  |  |  |  |  |  |  |  |
| NRA |  |  |  |  |  |  |  |  |  |  |  |  |  |
| SHOT Show |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Ground Transportation |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Meals |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Depreciation - Website Design |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Depreciation - Adv Ret Seg |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Amortization of GunUp |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Wages |  |  | 39,774 |  | 39,774 |  | 39,774 |  | 39,774 |  | 39,774 |  |  |
| Contract Labor |  |  | 1,592 |  | 1,592 |  | 1,592 |  | 1,592 |  | 1,592 |  |  |
| Bonuses, Other Wages |  |  | 1,042 |  | 1,042 |  | 1,042 |  | 1,042 |  | 1,042 |  |  |
| Benefits |  |  | 675 |  | 675 |  | 675 |  | 675 |  | 675 |  |  |
| Employee Profit Sharing |  |  | 1,557 |  | 1,557 |  | 1,557 |  | 1,557 |  | 1,557 |  |  |
| Federal Unemployment tax |  |  | 18 |  | 18 |  | 18 |  | 18 |  | 18 |  |  |
| State Unemployment tax |  |  | 1,277 |  | 1,277 |  | 1,277 |  | 1,277 |  | 1,277 |  |  |
| Medicare tax |  |  | 777 |  | 777 |  | 777 |  | 777 |  | 777 |  |  |
| Workers Comp |  |  | 229 |  | 229 |  | 229 |  | 229 |  | 229 |  |  |
| Social Security tax |  |  | 3,321 |  | 3,321 |  | 3,321 |  | 3,321 |  | 3,321 |  |  |
| Administration Fee |  |  | 338 |  | 338 |  | 338 |  | 338 |  | 338 |  |  |
| Suspense Accounts |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Total Expense | 736 | 736 | 54,091 | 736 | 51,334 | 736 | 54,091 | 736 | 51,334 | 736 | 51,334 | 3,494 | 736 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Other (Income) Expense |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Other Expense |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Total Other (Income) Expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Cash Excess/(Deficit) | 17,016 | 38,569 | (123,426) | 22,597 | (70,820) | 40,015 | (113,371) | 12,597 | (70,601) | 28,776 | (106,884) | (10,527) | (11,658) |

(347,717)

**<u>Exhibit C</u>**
**Budget**

MEDIA LODGE INC.
Proposed Budget
Cash Basis

| | | | | | | Week of | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15-Nov | 22-Nov | 29-Nov | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 1/3/2021 | 1/10/2021 | 1/17/2021 | 1/24/2021 | 1/31/2021 | 2/7/2021 |
| **ORDINARY INCOME / EXPENSE** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Income | | | | | | | | | | | | | |
| Banner Ads - Programmatic Ads | 1 | 1 | 2 | 150 | 150 | 150 | 200 | 150 | 150 | 150 | 200 | 150 | 150 |
| Banner Exchange | 40,000 | 50,000 | 103,875 | 30,000 | 40,000 | 50,000 | 116,105 | 20,000 | 30,000 | 40,000 | 60,000 | 61,944 | 38,086 |
| Total Income | 40,001 | 50,001 | 103,877 | 30,150 | 40,150 | 50,150 | 116,305 | 20,150 | 30,150 | 40,150 | 60,200 | 62,094 | 38,236 |
| | | | | | | | | | | | | | |
| Cost of Goods Sold | | | | | | | | | | | | | |
| Hosting / Data Center | - | 255 | - | - | - | 264 | - | - | - | 264 | - | - | - |
| Production Costs | - | 255 | - | - | - | 264 | - | - | - | 264 | - | - | - |
| | | | | | | | | | | | | | |
| Commission | - | - | - | | 39,038 | - | | - | 27,582 | | - | - | 27,582 |
| Advertising Consult - Programmatic | 1,651 | 1,305 | 651 | | | | | | 1,238 | 1,238 | 1,238 | 1,238 | 979 |
| Publisher Costs (Bloggers) | 13,780 | | 41,340 | - | 13,780 | | 41,340 | | 13,780 | | 41,340 | | 13,780 |
| Banner Exchange | - | 640 | - | - | - | 640 | - | - | - | 640 | - | - | - |
| Ad Creation/Graphic Desogn (For Advertisers) | - | 478 | - | - | - | 478 | - | - | - | 478 | - | - | - |
| Advertising Joint Venture | - | 1,200 | - | - | - | 1,200 | - | - | - | 1,200 | - | - | - |
| Ad Operations | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 | 6,818 |
| Video Production | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | - |
| Video Production Get Zone | - | - | 4,557 | - | - | - | 4,557 | - | - | - | 4,557 | - | - |
| Billable Expenses | | | | | | | | | | | | | |
|   Credit Card fees | - | - | 1,062 | - | - | - | 1,062 | - | - | - | - | 1,062 | - |
|   Gateway Fees | - | - | 10 | - | - | - | 10 | - | - | - | - | 10 | - |
| Advance Retail Segmentation Expense | - | - | 56,976 | - | | | 60,000 | | | | 60,000 | | |
| | | | | | | | | | | | | | |
| Selling Costs | 22,249 | 10,441 | 116,413 | 6,818 | 59,636 | 9,136 | 118,787 | 6,818 | 49,418 | 10,374 | 58,953 | 69,128 | 49,159 |
| Total Cost of Goods Sold | 22,249 | 10,696 | 116,413 | 6,818 | 59,636 | 9,400 | 118,787 | 6,818 | 49,418 | 10,638 | 58,953 | 69,128 | 49,159 |
| Gross Profit | 17,752 | 39,305 | (12,536) | 23,333 | (19,486) | 40,751 | (2,482) | 13,333 | (19,268) | 29,512 | 1,247 | (7,034) | (10,923) |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Expenses | | | | | | | | | | | | | |
| Administrative Expense | | | | | | | | | | | | | |
| Legal Fees | - | - | 56,798 | - | - | - | 56,798 | - | - | - | 56,798 | - | - |
| Total Administrative Expense | - | - | 56,798 | - | - | - | 56,798 | - | - | - | 56,798 | - | - |
| | | | | | | | | | | | | | |
| Expense | | | | | | | | | | | | | |
| Bank Service Charges | - | - | 202 | - | - | - | 202 | - | - | - | - | 202 | - |
| Wire Fees | | | | | | | | | | | | | |
| Software Subscriptions & Licenses | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 | 736 |
| Trade Organizations | | | | | | | | | | | | | |
| Office Supplies | - | - | 50 | - | - | - | 50 | - | - | - | - | 50 | - |
| Postage and Delivery | - | - | 25 | - | - | - | 25 | - | - | - | - | 25 | - |
| Telephone | - | - | 267 | - | - | - | 267 | - | - | - | - | 267 | - |
| Internet (Wi-Fi or Wired) | - | - | 163 | - | - | - | 163 | - | - | - | - | 163 | - |
| Miscellaneous | | | | | | | | | | | | | |

MEDIA LODGE INC.
Proposed Budget
Cash Basis

| | 15-Nov | 22-Nov | 29-Nov | 6-Dec | 13-Dec | 20-Dec | Week of 27-Dec | 1/3/2021 | 1/10/2021 | 1/17/2021 | 1/24/2021 | 1/31/2021 | 2/7/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ORDINARY INCOME / EXPENSE | | | | | | | | | | | | | |
| Office Equipment | | | | | | | | | | | | | |
| Ad Misc. | | | | | | | | | | | | | |
| Ad Production | - | - | 402 | - | - | - | 402 | - | - | - | - | 402 | - |
| Press Releases | | | | | | | | | | | | | |
| Technology | | | | | | | | | | | | | |
| Rent | - | - | 1,599 | - | - | - | 1,599 | - | - | - | - | 1,599 | - |
| Utilities | - | - | 50 | - | - | - | 50 | - | - | - | - | 50 | - |
| Operating Expenses for Buildings (part of Rent) | - | | | | | | | | | | | | |
| Other Taxes | | | | | | | | | | | | | |
| NRA | | | | | | | | | | | | | |
| SHOT Show | | | | | | | | | | | | | |
| Ground Transportation | | | | | | | | | | | | | |
| Meals | | | | | | | | | | | | | |
| Depreciation - Website Design | | | | | | | | | | | | | |
| Depreciation - Adv Ret Seg | | | | | | | | | | | | | |
| Amortization of GunUp | | | | | | | | | | | | | |
| Wages | | | 39,774 | | 39,774 | | 39,774 | | 39,774 | | 39,774 | | |
| Contract Labor | | | 1,592 | | 1,592 | | 1,592 | | 1,592 | | 1,592 | | |
| Bonuses, Other Wages | | | 1,042 | | 1,042 | | 1,042 | | 1,042 | | 1,042 | | |
| Benefits | | | 675 | | 675 | | 675 | | 675 | | 675 | | |
| Employee Profit Sharing | | | 1,557 | | 1,557 | | 1,557 | | 1,557 | | 1,557 | | |
| Federal Unemployment tax | | | 18 | | 18 | | 18 | | 18 | | 18 | | |
| State Unemployment tax | | | 1,277 | | 1,277 | | 1,277 | | 1,277 | | 1,277 | | |
| Medicare tax | | | 777 | | 777 | | 777 | | 777 | | 777 | | |
| Workers Comp | | | 229 | | 229 | | 229 | | 229 | | 229 | | |
| Social Security tax | | | 3,321 | | 3,321 | | 3,321 | | 3,321 | | 3,321 | | |
| Administration Fee | | | 338 | | 338 | | 338 | | 338 | | 338 | | |
| Suspense Accounts | | | | | | | | | | | | | |
| Total Expense | 736 | 736 | 54,091 | 736 | 51,334 | 736 | 54,091 | 736 | 51,334 | 736 | 51,334 | 3,494 | 736 |
| | | | | | | | | | | | | | |
| Other (Income) Expense | | | | | | | | | | | | | |
| Other Expense | | | | | | | | | | | | | |
| Total Other (Income) Expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Cash Excess/(Deficit) | 17,016 | 38,569 | (123,426) | 22,597 | (70,820) | 40,015 | (113,371) | 12,597 | (70,601) | 28,776 | (106,884) | (10,527) | (11,658) |

(347,717)