**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| MEDIA LODGE, INC., | ) ) | Case No. 20-12969 (JTD) |
| Debtor. | ) ) ) ) ) ) | **Hearing Date: 01/11/21 at 10:00 a.m. (ET)**<br>**Objection Deadline: 12/17/20 at 4:00 p.m. (ET)**<br><br>**Re: Dkt. Nos. 1, 46, 61, 65** |

**GUNUP, INC.'S REPLY IN SUPPORT OF**
**MOTION TO DISMISS CHAPTER 11 CASE**

Media Lodge, Inc. ("Media Lodge") acknowledges that "it is the burden of the bankruptcy petitioner to establish that good faith exists." (Dkt. No. 61, p. 7, citing *In re Tamecki*, 292 F.3d 205, 207 (3d Cir. 2000)). "When it is the debtor that bears the burden of proving good faith more than vague assertions are needed." *In re Thompson*, No. 16-22532, 2016 Bankr. LEXIS 3844, at *3 (Bankr. D.N.J. Oct. 27, 2016), *citing Tamecki*, 292 F.3d 205. Media Lodge's Opposition (Dkt. No. 61) is based on nothing but assertions that are vague, self-serving, and unsupported by evidence. Media Lodge has not shown that it filed its Chapter 11 bankruptcy petition in good faith, and the Court should therefore dismiss this case under 11 U.S.C. § 1112(b).

**ARGUMENT**

**I.     Dismissal for Cause under 11 U.S.C. § 1112(b).**

1.     As Media Lodge acknowledges in its Opposition at page 7, a bankruptcy petition filed in bad faith may be dismissed "for cause" under 11 U.S.C. § 1112(b). *In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 (3d Cir. 2009); *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999); *In re Rent A-Wreck of America, Inc.*, 580 B.R. 364, 373 (Bankr. D. Del. 2018).

1

Media Lodge must prove that it filed its petition in good faith. *15375 Mem'l*, 589 F.3d at 618; *SGL Carbon*, 200 F.3d at 162 n.10; *Rent A-Wreck*, 580 B.R. at 374. The "two inquiries 'particularly relevant to the question of good faith' [are] (1) whether the petition serves a valid bankruptcy purpose, e.g. by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed to obtain a tactical advantage." *Rent-A-Wreck*, 580 B.R. at 374 (quoting *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119–20 (3d Cir. 2004)). Media Lodge's Opposition only confirms that the Court should dismiss this case for cause under § 1112(b).

## II.     Media Lodge Has Not Proved that It Filed Its Bankruptcy Petition to Preserve Itself as a Going Concern.

2.     Media Lodge argues that it filed its bankruptcy petition in part to "[p]reserv[e] the Debtor as a going concern by protecting its customers from harassment and preventing further customer attrition." (Dkt. 61, first page (unnumbered).) It contends that this is a "valid purpose[ ] to seek protection of the bankruptcy code." (*Id.* at p. 1.)

3.     The contention that Media Lodge filed its petition to "protect[ ] its customers from harassment and prevent[ ] further customer attrition" is unsupported—in fact refuted—by the record that Media Lodge itself has placed before the Court. This is because Media Lodge strenuously maintains that Glock, Inc. ("Glock") and the other advertising clients against which GunUp, Inc. ("GunUp") could have initiated garnishment proceedings are *not* customers of Media Lodge, but of its subsidiary, Media Lodge, LLC ("LLC Sub"). (Dkt. No. 61, p. 6 ("Glock owed advertising payments to LLC Sub, not to the Debtors [sic].... GunUp did not have and never had any judgment against LLC Sub and thus, the effort to garnish amounts owed to LLC Sub was improper and harassing.").)

4. Assuming Media Lodge is correct that GunUp's service of a summons of garnishment on Glock was improper because advertiser payments are owed to LLC Sub, Media Lodge could have contested GunUp's garnishment action against Glock in Cobb County (Georgia) Superior Court. As Media Lodge states in its Opposition, GunUp filed the garnishment action on October 7, 2020. (Dkt. No. 61, p. 6.) Exhibit I to Media Lodge's Opposition shows that Media Lodge received notice of the action shortly thereafter. (Dkt. No. 61-8, pp. 1 of 9, 2 of 9.) The summons of garnishment directed Glock to "immediately hold all money, including wages, and other property, except what is known to be exempt, … belonging to the Defendant or obligations owed to the Defendant named above"—that is, belonging or owed to Media Lodge. (Dkt. No. 61-8, p. 4 of 9.) It further directed Glock to file an answer between 30 and 45 days after service of the summons, and stated: "Defendant has Ten (10) days from the date of service in which to file a petition or request for a hearing to dissolve the garnishment." (*Id.* at pp. 3 of 9, 5 of 9.) As far as GunUp is aware, Media Lodge filed no petition in Cobb County Superior Court, and made no effort to dissolve the garnishment. (Declaration of Duncan E. Manville Regarding GunUp, Inc.'s Reply in Support of Motion to Dismiss Chapter 11 Case ("Manville Reply Decl.") ¶ 3.) Nor did Media Lodge advise GunUp that Glock and the other advertisers were customers of LLC Sub, not Media Lodge, or request that GunUp refrain from attempting to collect money owed to LLC Sub. (*Id.*)[1]

---

[1] When GunUp caused the summons of garnishment to be served on Glock, it had no idea that LLC Sub even existed, let alone that LLC Sub (allegedly) held the contracts with Media Lodge's advertiser clients, or that the advertisers (allegedly) owed their payments to LLC Sub. (Manville Reply Decl. ¶ 4.) As Media Lodge states in its Opposition, Media Lodge held the advertiser contracts and received all advertiser payments until 2019, well after conclusion of the trial in the Washington Lawsuit. (Dkt. No. 61, p. 4.) In response to discovery requests in aid of execution that GunUp served on Media Lodge in February 2020, Media Lodge did not disclose the existence of its subsidiary entities. (Manville Reply Decl. ¶ 4.) And when GunUp deposed Steve Urvan in May 2020, he refused to answer any questions about the restructuring during which LLC Sub and GunUp Publishing, Inc. were brought into existence. (*Id.*, Ex. A at 15:8–16:20.)

5.      Equally unsupported by the record is Media Lodge's contention that GunUp's garnishment of funds in Media Lodge's account at Bank of America threatened to put Media Lodge out of business. (Dkt. No. 61, p. 8.) Media Lodge states in its Opposition that all payments from advertiser clients are received by LLC Sub, not Media Lodge. (Dkt. No. 61, pp. 3–4, 6.) Media Lodge's CEO, Jeff Siegel, testified during the Section 341 meeting of creditors on December 9, 2020 that LLC Sub maintains its own bank account separate from Media Lodge's account at Bank of America, and that all payments received from advertiser clients are deposited into LLC Sub's account, not the Bank of America account. (Manville Reply Decl., Ex. B at 3:2–6:24.) LLC Sub then pays GunBroker.com, LLC ("GunBroker") its revenue share, and "upstreams the remainder of ad revenue to the Debtor." (Dkt. No. 61, p. 6.) Thus, according to Media Lodge's Opposition and the testimony of its CEO, the freezing of its account at Bank of America did not prevent LLC Sub from receiving advertiser payments. And Media Lodge does not explain why this revenue could not have been applied to publisher and vendor obligations without the need to funnel it through the Bank of America account.[2]

6.      In sum, the record that Media Lodge has placed before the Court strongly suggests that GunUp's modest collection efforts did not threaten Media Lodge's business in any way. Rather, Media Lodge used those efforts as a pretext to file for bankruptcy in an effort to avoid paying some or all of the judgment obtained by GunUp in the Washington Lawsuit

---

[2] Although GunUp submits that the Court may rely on Media Lodge's representations in its bankruptcy papers and on the sworn testimony of its CEO, GunUp does not concede the accuracy of the representations or testimony. In post-judgment discovery in the Washington Lawsuit, Media Lodge produced a bank transaction report for its Bank of America account for the period from January 1, 2018 to February 28, 2020 showing hundreds of deposits received by Media Lodge (not LLC Sub) directly from advertisers, and numerous substantial payments made by Media Lodge (not LLC Sub) directly to GunBroker. (Manville Reply Decl. ¶ 6.) If the Court allows this proceeding to continue, the apparent discrepancies between, on the one hand, Media Lodge's representations and Mr. Siegel's testimony and, on the other, the information contained in Media Lodge's financial records will need to be explored.

(the "Judgment").  That is not a valid bankruptcy purpose.  *See, e.g., In re EFL Partners X*, No. 13–11495–MDC, 2013 Bankr. LEXIS 3446, at *14–15 (Bankr. E.D. Pa. Aug. 22, 2013) (debtor's intent to hinder creditors is evidence of bad faith).

### III.   Media Lodge Has Not Proved that It Filed Its Bankruptcy Petition to Reduce or Eliminate Legal Fees.

7.   Media Lodge argues that it filed its bankruptcy petition in part for the supposedly valid bankruptcy purpose of "[s]top[ing] the bleeding of litigation expenses caused by GunUp Inc.'s litigation efforts."  (Dkt. No. 61, first page (unnumbered).)  Media Lodge does not elaborate on this contention, which again is unsupported by the record.

8.   Media Lodge vaguely references lawsuits underway against its current and former directors (*id.*, first page (unnumbered), p. 5), but other than the garnishment proceedings discussed above, the only pending litigation to which the automatic bankruptcy stay might arguably have applied was Media Lodge's appeal in the Washington Lawsuit.  However, Media Lodge declared at the outset of this case that it intended to prosecute the appeal to conclusion.  As it asserted in its DIP Financing Motion, it needed "a significant cash infusion in order to continue to prosecute its appeal of the Judgment, which the Debtor believes will be successful." (Dkt. No. 8, p. 4 of 71.)  Indeed, Media Lodge recently sought and obtained an order from this Court lifting the bankruptcy stay so it could proceed with the appeal.  (Dkt. Nos. 59, 72.) Especially since Media Lodge has already paid its bankruptcy counsel at least $100,000 (Dkt. No. 1, p. 13), it is difficult to see how the filing of this case will not substantially *increase* Media Lodge's total legal fees and costs.[3]

---

[3] Further with regard to the separate lawsuits against Media Lodge's current and former directors: Media Lodge vaguely asserts that GunUp has "sued or attempted to sue every officer or director that served with Debtor and continues to pursue some of those individuals to this day," and that "[t]he legal costs to defend the officers and directors has [sic] been substantial.  (Dkt. No. 61, p. 5.)  In fact, Media Lodge has never had more than three directors, only two separate lawsuits (against former directors

## IV. Allowing Media Lodge the Benefit of the Payment Provisions of § 1191 of the Bankruptcy Code Is Not a Valid Bankruptcy Purpose.

9. Media Lodge argues that it filed its bankruptcy petition in part to "[a]llow the Debtor benefit of the payment provisions of section 1191 of the Bankruptcy Code." (Dkt. 61, p. 1.) Again, it contends that this is a "valid purpose[ ] to seek protection of the bankruptcy code." (*Id.*)

10. Media Lodge does not elaborate on this argument or cite any legal authority to support it. And in fact, the argument is precisely backward: A bankruptcy petitioner's intention to seek approval of a reorganization plan does not establish a valid bankruptcy purpose; rather, a reorganization plan proposed by a bankruptcy petitioner must *serve* a valid bankruptcy purpose—such as "preserv[ing] some going concern value … or … maximizing the value of the debtor's estate." *Integrated Telecom Express*, 384 F.3d at 120 n.4. "The fact that a petitioner desires to invoke the Code's distributional mechanisms to distribute estate assets to a different party is not a valid bankruptcy purpose." *In re Dewey Commercial Investors, L.P.*, 503 B.R. 643, 650 (Bankr. E.D. Pa. 2013). A petition "must seek to create or preserve some

---

Steve Urvan and Kevin O'Connell) are pending, and there is no evidence that Media Lodge has had to pay substantial legal fees in connection with those cases. In the lawsuit against Mr. Urvan (U.S. District Court for the Northern District of Georgia Cause No. 1:20-CV-2340-LMM), Mr. Urvan removed the case from state to federal court on June 1, 2020, and promptly filed a motion to dismiss that remains pending; no discovery has been conducted, and there has been no other significant activity in the case. (Manville Reply Decl. ¶ 7.) In the lawsuit against Mr. O'Connell (Orange County (California) Superior Court Cause No. 30-2019-01117939-CU-MC-CJC), the state court entered a default against Mr. O'Connell, Mr. O'Connell successfully moved to have the default set aside, and Mr. O'Connell filed an answer on January 4, 2021; again, no discovery has been conducted, and there has been no other significant activity in the case. (*Id.* at ¶ 8.) Given the posture of these cases, it is difficult to imagine that either lawsuit has "placed an enormous strain on" Media Lodge. (Dkt. No. 61, p. 5.) Indeed, Media Lodge's list of transfers made before its bankruptcy filing shows only two modest payments to Mr. Urvan's counsel, Krevolin Horst LLC, and no payments to Mr. O'Connell's counsel. (Dkt. No. 54-1; Manville Reply Decl. ¶¶ 7, 8.)

value that would otherwise be lost—not merely distributed to a different stakeholder—outside of bankruptcy." *Integrated Telecom Express*, 384 F.3d at 108.

### V. Determining the Value of Claims Against Media Lodge Is Not a Valid Bankruptcy Purpose.

11. Media Lodge argues that it filed its bankruptcy petition in part to "[d]etermine the value of claims against it, in particular the GunUp, Inc. claim." (Dkt. 61, p. 1.) Again, it contends that this is a "valid purpose[ ] to seek protection of the bankruptcy code." (*Id.*)

12. Whatever Media Lodge might intend here, it cites no legal authority for the proposition that seeking a judicial determination of the value of a claim constitutes a valid bankruptcy purpose. Again, Media Lodge gets the argument backward: As the court noted in *Chase Manhattan Bank, N.A. v. Francini*, No. 91 Civ. 2515 (MBM), 1991 U.S. Dist. LEXIS 11381 (S.D.N.Y. Aug. 16, 1991), valuation does not establish a valid bankruptcy purpose; rather, it should only be undertaken *for* a legitimate bankruptcy purpose. *Id.* at *10 (quoting *In re Larson*, 99 Bankr. 1, 3–4 (Bankr. D. Alaska 1989)).

### VI. Media Lodge's Other Arguments Do Not Establish a Valid Bankruptcy Purpose.

13. Media Lodge's remaining arguments (set forth in its Opposition at pages 9–12) are predicated on the notion that it was in immediate financial distress at the time of its bankruptcy filing. This is so, it says, because its upstream affiliate, Gemini Direct Investments, LLC ("GDI"), had "limited its future funding commitments to $500,000 through a debtor-in-possession loan." (Dkt. No. 61, p. 11.) Plainly, Media Lodge would not be in immediate financial distress if GDI were willing to maintain the status quo—involving payment by LLC Sub (or Media Lodge) of significant sums to GunBroker, and advancement of smaller amounts by GDI (or another affiliate) back to Media Lodge to cover the resulting operational shortfalls.

14. The suggestion that GDI will only provide additional funding to Media Lodge through a DIP loan is self-serving and incredible on its face, and the Court need not give it any weight. *See In re Roxy Real Estate Co.*, 170 B.R. 571, 573 (Bankr. E.D. Pa. 1993) ("[i]t is unlikely that a debtor will ever acknowledge its own bad faith"); *In re Exide Techs.*, 340 B.R. 222, 246 (Bankr. D. Del. 2006) (discounting witness testimony and noting that "[i]n considering the appropriate weight to accord each witness, a court may accept all of a witness' testimony, reject all of it, or accept some and reject other parts depending upon the credibility of the witness"). According to Media Lodge, funding from GDI is needed in large measure to pay attorneys' fees that Media Lodge anticipates incurring on appeal in the Washington Lawsuit. (Dkt. No. 8, p. 4 of 71.) It is inconceivable that after having invested substantial sums in that unsuccessful litigation and having funded the drafting and filing of Media Lodge's opening appellate brief, Media Lodge's affiliates would simply pull the plug on the appeal (which Media Lodge says it "believes will be successful," *id.*) and allow the Judgment to stand absent an order authorizing DIP financing.

15. Equally unworthy of credence is Media Lodge's contention that its affiliates could simply abandon it by causing GunBroker to bypass Media Lodge and contract on similar terms with a third-party advertising broker. (Dkt. 61, pp. 10–11.) Media Lodge has lost over $9 million since its inception. (*Id.* at p. 5.) It suggests that GunUp is largely to blame—that Media Lodge "has historically operated at break even or in the red" "in large part due to the misrepresentation and under-performance of the assets acquired from GunUp Inc., and the continued legal expenses caused by GunUp Inc.'s litigation"—but this *ipse dixit* is unsupported by evidence. Nor does the record contain any evidence that GunBroker could actually enter into an agreement with an independent advertising broker on terms similar to the agreement

between LLC Sub and S&T Logistics, LLC. Instead, the record shows that year after year, Media Lodge and LLC Sub have paid GunBroker far more than they have received in intercompany loans—profits that GunBroker has retained to the detriment of Media Lodge and its creditors. (Dkt. No. 46, pp. 7–8.) The record thus compels the conclusion that Media Lodge loses money because it overpays GunBroker, and that no third-party broker would be in a position to offer GunBroker a similarly advantageous deal.

16. In any event, even if Media Lodge were in immediate financial distress, it has not cited any case holding that this alone would be enough to establish good faith. Indeed, courts routinely hold that debtors in immediate financial distress commence bankruptcy proceedings in bad faith when they file with the intent of preventing foreclosure or hindering creditors. *See, e.g., EFL Partners X*, 2013 Bankr. LEXIS 3446, at *14–15.

## CONCLUSION

17. Media Lodge has not met its burden of proving that it filed its Chapter 11 bankruptcy petition for a valid bankruptcy purpose, such as preserving a going concern or maximizing the value of its estate. The record demonstrates that Media Lodge had no need to file its petition, and commenced this proceeding with the objective of hindering GunUp's effort to recover the damages it was awarded in the Washington Lawsuit. Because Media Lodge filed this case in bad faith, the Court should dismiss it.

| | |
|---|---|
| Dated: January 6, 2021<br>Wilmington, Delaware | KLEIN LLC<br><br>*/s/ Julia B. Klein*<br>Julia B. Klein (DE 5198)<br>225 W. 14th Street, Suite 100<br>Wilmington, Delaware 19801<br>(302) 438-0456<br>klein@kleinllc.com |

and

Duncan E. Manville, WSBA #30304
SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue, Suite 800
Seattle, Washington 98101-2272
Tel.: (206) 749-0500
Fax: (206) 749-0600
dmanville@sbwllp.com

*Attorneys for Creditor GunUp, Inc.*